Nos. 23-1494

IN THE

# United States Court of Appeals for the Federal Circuit

APPLE INC.,

*Appellant,*

*v.*

GESTURE TECHNOLOGY PARTNERS, LLC

*Appellee.*

On Appeal from the United States Patent & Trademark Office, Patent Trial & Appeal Board, Nos. IPR2021-00923, IPR2022-00093, IPR2022-00361

## OPENING BRIEF OF APPELLANT APPLE INC.

Paul R. Hart
ERISE IP, P.A.
5299 DTC Blvd.
Suite 1340
Greenwood Village, CO 80111

Adam P. Seitz
Clifford T. Brazen
ERISE IP, P.A.
7015 College Blvd.
Suite 700
Overland Park, KS 66211

Abigail Colella
Melanie L. Bostwick
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
(202) 339-8400

Elizabeth R. Moulton
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

*Counsel for Appellant Apple Inc.*

# CLAIM LANGUAGE AT ISSUE

## U.S. Patent No. 8,194,924, Claim 1

**1.** A handheld device comprising:

a housing;

a computer within the housing;

a first camera oriented to view a user of the handheld device and having a first camera output; and

a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## AMENDED CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 23-1494 |
| **Short Case Caption** | Apple Inc. v. Gesture Technology Partners, LLC |
| **Filing Party/Entity** | Apple Inc. |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: August 3, 2023

Signature:  /s/ Abigail Colella

Name:  Abigail Colella

**ii**

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Apple Inc. | None | None |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐    Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)     ☐  No     ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

**iv**

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ............................................................... ii

TABLE OF AUTHORITIES .................................................................. vii

STATEMENT OF RELATED CASES ...................................................... ix

INTRODUCTION .................................................................................. 1

STATEMENT OF JURISDICTION ........................................................ 3

STATEMENT OF THE ISSUES ............................................................ 3

STATEMENT OF THE CASE ............................................................... 4

    Camera devices and methods of controlling such devices with
        human gesture have been known for decades. ...................... 4

    Beginning in 1999, Gesture Technology seeks patent
        protection for a wide range of ideas related to optically
        detecting human gesture input ............................................. 8

    Gesture Technology sues Apple for infringement and Apple
        seeks inter partes review. .................................................... 14

    The Board finds that Apple's Mann prior art reference is not
        analogous art, and therefore upholds the challenged
        claims ................................................................................. 19

SUMMARY OF THE ARGUMENT ...................................................... 22

STANDARD OF REVIEW ................................................................... 24

ARGUMENT ...................................................................................... 25

I.    The Board's Finding That Mann Is Non-Analogous Art
      Is Unsupported By Substantial Evidence. .......................... 25

    A.    The '924 patent's field of endeavor is a camera
        system controlled by human gesture input. ............... 26

    B.    The Board erred in finding that the '924 patent's
        field of endeavor is limited to devices that
        optically sense human inputs, because that
        narrow field of endeavor is the purported point of
        novelty. ...................................................................... 34

C.     Applying the patent's correct field of endeavor, Mann is analogous art. ............................................... 39

II.     The Board Violated The APA By Articulating An Entirely New Field Of Endeavor Without Giving Apple An Opportunity To Respond. ................................................ 42

CONCLUSION ........................................................................ 46

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Belden Inc. v. Berk-Tek LLC,*
  805 F.3d 1064 (Fed. Cir. 2015) ......................................... 24

*In re Bigio,*
  381 F.3d 1320 (Fed. Cir. 2004) ........................... 24, 25, 27, 32, 38, 41

*In re Clay,*
  966 F.2d 656 (Fed. Cir. 1992) .......................................... 25

*Consolidated Edison Co. v. NLRB,*
  305 U.S. 197 (1938) .................................................... 24

*In re Gartside,*
  203 F.3d 1305 (Fed. Cir. 2000) ......................................... 24

*Graham v. John Deere Co.,*
  383 U.S. 1 (1966) ...................................................... 25

*In re IPR Licensing, Inc.,*
  942 F.3d 1363 (Fed. Cir. 2019) ......................................... 42

*In re Mettke,*
  570 F.3d 1356 (Fed. Cir. 2009) ......................................... 37

*Nike, Inc. v. Adidas AG,*
  955 F.3d 45 (Fed. Cir. 2020) ........................................... 42

*Old Town Canoe Co. v. Glenwa, Inc.,*
  55 F. Appx. 918 (Fed. Cir. 2003) ....................................... 25

*Qualcomm Inc. v. Intel Corp.,*
  6 F.4th 1256 (Fed. Cir. 2021) .......................................... 45

*Regent Lighting Corp. v. FL Indus., Inc.,*
  No. 94-1162, 1995 WL 331122 (Fed. Cir. June 2, 1995) .................... 36

*Rovalma, S.A. v. Bohler- Edelstahl GmbH & Co. KG,*
   856 F.3d 1019 (Fed. Cir. 2017) ......................................................... 24

*Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.,*
   66 F.4th 1373 (Fed. Cir. 2023) ..................................................... 31, 32

*SAS Inst., Inc. v. ComplementSoft, LLC.,*
   825 F.3d 1341 (Fed. Cir. 2016) ......................................................... 42

*State Contracting & Engineering Corp. v. Condotte America,*
   346 F.3d 1057 (Fed. Cir. 2003) ................................................... 40, 41

*Unwired Planet, LLC v. Google Inc.,*
   841 F.3d 995 (Fed. Cir. 2016) .........................25, 26, 27, 28, 33, 34, 37

*Wyers v. Master Lock Co.,*
   616 F.3d 1231 (Fed Cir. 2010) ......................................................... 25

## Statutes & Regulations

5 U.S.C. §§ 551-559 ............................................................. 3, 23, 24, 42

5 U.S.C. § 706(2) ............................................................................. 24

28 U.S.C. § 1295(a)(4)(A) ................................................................. 3

35 U.S.C. § 141(c) ............................................................................. 3

35 U.S.C. § 142 ................................................................................. 3

35 U.S.C. § 311(a) ............................................................................. 3

35 U.S.C. § 319 ................................................................................. 3

37 C.F.R. § 90.3(a)(1) ....................................................................... 3

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding has previously been before this or any other appellate court.

This Court's decision may directly affect or be directly affected by the following cases that involve the same patent at issue in this appeal: *Gesture Tech. Partners, LLC v. Apple, Inc.* No. 4:22-cv-04806 (N.D. Cal.); *Gesture Tech. Partners, LLC v. LG Elecs., Inc. et al.*, No. 2:21-cv-19234 (D.N.J.); *Gesture Tech. Partners LLC v. Motorola Mobility LLC*, No. 1:22-cv-03535 (N.D. Il.); *Gesture Tech. Partners, LLC v. Lenovo Grp. Ltd. et al.*, No. 6:21-cv-00122 (W.D. Tex.).

The Court's decision may also directly affect or be directly affected by the following co-pending appeals involving other patents owned by Gesture Technology, which this Court has designated as companion cases to this appeal: *Gesture Tech. Partners, LLC v. Unified Patents, LLC*, No. 23-1444 (Fed. Cir.); *Apple Inc. v. Gesture Tech. Partners LLC*, No. 23-1475, -1533 (Fed. Cir.).

## INTRODUCTION

This appeal involves a simple obviousness case, short-circuited by the Board's erroneous conclusion that one reference did not meet the minimal, "analogous art" threshold required to even be considered as prior art.  The reference in question, known as "Mann," discloses a device with the same physical structure as the claimed invention: a handheld computer with two cameras.  And it discloses the same way of controlling that device: using human gestures as input.  The only difference is that Mann's device is controlled with gestural input on a touch screen and not gestural input captured by the cameras, as required by the claimed invention and disclosed in Apple's other references.  Apple's petition explained that Mann is analogous art to the patent because both are within the same, broad field of endeavor: "camera system[s] that may be controlled by human gesture input." Appx106.  Apple offered a similar showing for each other reference, slightly varying its articulation of the field to emphasize the aspects of each reference most relevant to the obviousness ground.

The Board's analogous art analysis went awry by treating the slight variation in Apple's articulations of the field of endeavor as

"contradictory" statements that required scrapping Apple's entire approach. The Board drifted even further afield when it adopted a new field of endeavor definition, untethered to the arguments of either party, that limited analogous art to devices that already use the claimed camera-based gesture-sensing technique. This move, which resulted in Mann's disqualification as prior art, improperly limited the patent's field of endeavor to the patent's specific point of novelty over prior art. Under the correctly understood field, there is no question that Mann is analogous. This Court should reverse the Board's analogous art ruling and remand for consideration of the merits of Apple's obviousness grounds.

Independent of its substantive error, the Board made a procedural error as well. While the patent owner, Gesture Technology, complained that Apple had not shown that *the Mann reference* was within the field of "camera system[s] that may be controlled by human gesture input," it did not dispute that *the challenged patent* was within the field of endeavor Apple articulated. The Board ignored the parties' agreement on this issue, identified its own, narrower field of endeavor sua sponte in the Final Written Decision, and found that Mann did not fall within

2

the Board's newly announced field. The Board's failure to give Apple notice and an opportunity to respond to its new definition of the patent's field of endeavor violates the Administrative Procedure Act, codified at §§ 551-559 and separately requires a remand.

## STATEMENT OF JURISDICTION

The Board had jurisdiction over Apple's petition for inter partes review pursuant to 35 U.S.C. § 311(a). The Board issued its Final Written Decision on December 2, 2022. Appx1-20. Apple timely filed a notice of appeal on February 3, 2023. *See* 35 U.S.C. § 142; 37 C.F.R. § 90.3(a)(1). This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319.

## STATEMENT OF THE ISSUES

1.      Whether substantial evidence supports the Board's finding that Mann is non-analogous to the '924 patent when both Mann and the '924 patent are within the field of camera systems controlled by human gesture input.

2.      Whether the Board violated the APA by finding Mann to be non-analogous art when the "field of the invention" adopted in the

3

Board's analysis was not advanced by either party and when Apple had no opportunity to challenge the Board's sua sponte definition.

## STATEMENT OF THE CASE

### *Camera devices and methods of controlling such devices with human gesture have been known for decades.*

By the late 1990s, cameras were everywhere: from security cameras in department store ceilings, to digital camcorders used to record home videos, to tiny cameras housed in a pair of eyeglasses. *E.g.* Appx774; Appx53 18:38. One of these new camera devices was described in the Mann reference, a Canadian patent publication from 1998 disclosing a "hand-held portable electronic camera system" used to "capture events in a natural manner with minimal intervention or disturbance." Appx773. Mann offered different form factors, including both a Personal Digital Assistant ("PDA") and a wristwatch, with cameras for recording events. Mann's PDA embodiment, for instance, is a handheld device with two cameras: one facing out (element 110 in the image below), to "capture[] a view of a person standing in front of the user," and one facing up (element 150), so the user can "make a video recording of himself/herself while [also] recording another person." Appx783-784; Appx796.

4



Appx796.  Mann's wristwatch embodiment has the same basic camera

structure: one camera facing out (element 310) at a subject and another

facing up at the user (element 350).  Appx783-784; Appx798.



Appx798.  Because the cameras in these devices "will typically be

pointed at a [subject] at all times," they can capture video without the

subject knowing "whether or not the apparatus is … recording."
Appx775.

Mann recognized that users would need some way to control these
camera devices. It explained that the wristwatch could be controlled
using a touch screen on the watch face. By swiping a finger in different
directions, a user could start or stop recording and even enter
information like letters and numbers. Appx799 (diagram of wristwatch
control); Appx785-787. Similarly, users of Mann's PDA embodiment
could take notes and annotate recordings by writing on the device's
screen with an "electronic pen" like a "stylus." Appx784-785. And
skilled artisans would understand that Mann's pen could also be used
to perform control functions like starting or stopping recording.
Appx698.

At the same point in the late 1990s that Mann was developing
portable camera systems controlled by gestural input on a screen, other
inventors were developing non-touch ways of controlling a computer,
including by using cameras to track human gestures. Appx902 1:30. In
1997, Numazaki and his team of inventors from Toshiba submitted a
patent application disclosing a method and apparatus for optically

detecting a person's gestures by way of "photo detection units"—that is,
cameras—and using those gestures to control computer functions.
Appx903 4:9-40; Appx906 10:57-66; Appx915 27:41-56; Appx700.
Numazaki's invention, which issued in November 2000 as U.S. Patent
No. 6,144,366 to "Numazaki," allowed a user to control a "cursor" using
"finger tip gestures" in lieu of a traditional "input device like [a] mouse."
Appx902 1:14-15, 26; Appx915 28:29-67.

Numazaki provides that its gesture-detection technique may be
implemented in a handheld (or wrist-worn) device.




Appx876-877.  As depicted in Figure 78, the user can "control[]" the
"position of a cursor 714" "by moving a finger 713 in front of this
window 712."  Appx927 52:12-16.  Figure 79 shows a similar

implementation of the camera-based control technique on a wristwatch computer, again allowing the user to control the device "by moving a finger" in front of the wristwatch's camera.  Appx927 52:20-33.

Other inventors also used cameras to detect and respond to human gesture.  In 1997, U.S. Patent No. 5,666,157 to "Aviv" disclosed a camera-based surveillance system that would identify human "movements … indicative of individuals having criminal intent" and then send out an "alarm signal" if criminality was detected.  Appx959 Abstract; *see also* Appx967-968 6:13-26, 7:5-28.  Similarly, in 1999, a team of inventors from IBM developed a camera-based system to map subjects' pupils and determine what the subjects are looking at.  Appx947-958 (U.S. Patent No. 6,539,100 to "Amir").  The system could then "use[] pupil-subject mapping as an input" to control computer functions.  Appx952 4:52-54.

### *Beginning in 1999, Gesture Technology seeks patent protection for a wide range of ideas related to optically detecting human gesture input.*

At the same time Mann, Numazaki, and others were describing devices controlled by human gesture, Gesture Technology's founder, Timothy Prior, was also busy conceptualizing ways in which human

gesture could be used to control computers.  In July 1999, he filed a

provisional patent application, followed by a non-provisional application

in July 2000.  Appx21.  A series of continuation applications ensued.

Appx21.  The patent at issue in this case, U.S. Patent No. 8,194,924,

issued in June 2012 from an application filed in March 2011.  Appx21.

It is a continuation of U.S. Patent No. 7,933,431 (which is at issue in

the companion appeals, Case Nos. 23-1444 and 23-1475, 1533), and it

either cross-references or incorporates by reference over a dozen

additional "patents and co-pending patent applications" by Mr. Prior

"having similar subject matter."  Appx45.  The '924 patent supplements

the '431 patent's specification with several paragraphs (Appx57 25:50-

26:51) and one figure (Appx44) imported from yet another of Mr. Prior's

patents.  Appx21; Appx597-601.  Aside from that, the '924 and '431

specifications are virtually identical.[1]  Appx21.

The '924 patent is titled "Camera based sensing in handheld,

mobile, gaming or other devices."  Appx21.  According to the "Field of

the Invention," the inventor's goal was to use "human positions or

---

[1] For purposes of this proceeding, and without forfeiting future
challenges, Apple treats July 8, 1999, as the priority date for the '924
patent claims.  *See* Appx97.

orientations" (i.e., gestures) as an "input … for computers." Appx45 2:7-19. To that end, the patent discloses a technique for using a camera to sense "targets," like "the fingers, hand, feet and head of the user, or objects … held by a user." Appx46 3:20-23, 39-40; Appx50 11:65-12:12. It then expounds on various applications in which camera-based sensing can be used to enable gesture-based control. Appx45 2:7-24 (disclosing "new applications [of the technique] in a variety of fields"); *see* Appx21 (noting "practical applications, including, but not limited to, handheld devices, cars, and video games").

One core application is to replace or enhance existing forms of gestural computer input (like swiping a finger across a touch screen) with camera-based gestural control. A "hand held device" with a camera pointing at the user can be used to capture images of "[o]ne's fingers," and "allows conversing with the computer in a form of sign language" to "replace the keyboard of a conventional computer." Appx57 25:54-57. Or a camera could capture images of "a pencil or pen" in the user's hand, "and thus can be used rather than having a special touch screen and pencil." Appx57 25:58-60. And "point[ing] at a board

... with a finger" could be used "much like touching an icon on a conventional computer touch screen." Appx55 21:33-49.

The patent also describes embodiments in which camera-based sensing is added to existing, physical systems in order to enhance their computer functionality. One can add camera-based sensing to "a handheld device which itself has functions (for example, a cell phone)" so it can be pointed in different directions for use as a remote control. Appx50 11:65-66. In another embodiment, the patent applies camera-based tracking to a physical board game: it optically tracks a human's real-world interaction with a "traditional monopoly board (chess board, checker board, etc.)" and uses the images of the interaction to control a computerized version of the game with "various added features." Appx53 17:25-35, 39-41. This "allow[s] a physical nature of the game just as the real game, but with new aspects." Appx53 17:25-35. In a "car dashboard application," Appx47 6:29, the optical-control technique is used to sense and respond to the driver's interaction with the car's physical components, for instance by tracking the driver's adjustment to a "movable plastic air outlet ... in the dashboard" then "combining this" with information about "other outlets, air temperature and the like, to

11

perfect control of the ambiance of the car interior." Appx51 14:49-55;

*see also* Appx51 14:18-20, 42-55; Appx52 15:53-60.

Figure 18 shows one example of the '924 patent's application of

optically detected gesture-based control:



Fig. 18

Appx44. The handheld computer device (1901) of Figure 18 has two

cameras (1910 and 1902). Appx57 25:40-45. One of the cameras (in the

Figure, camera 1902) "can optionally be rotated about axis 1905 so as to

look at the user or a portion thereof such as finger 1906, or at objects at

which it is pointed." Appx57 25:41-43. As described throughout the

specification, the handheld computer uses the camera to capture

gestures and control the computer. Appx57 25:50-63. For example, the camera facing the user can capture images of "a pencil or pen" in one's hand "and thus can be used rather than having a special touch screen and pencil." Appx57 25:58-60.

Despite the '924 patent's broad disclosure, its claims are limited to a device like that shown in Figure 18: a handheld computer device with two cameras, one facing the user, the other facing out, wherein the device uses the cameras to control computer functions. Appx57 26:54-65. Independent claim 1, from which all other claims depend, reads as follows:

> 1. A handheld device comprising:
>
> a housing;
>
> a computer within the housing;
>
> a first camera oriented to view a user of the handheld device and having a first camera output; and
>
> a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.

Appx57 26:54-65.

***Gesture Technology sues Apple for infringement and Apple seeks inter partes review.***

In February 2021, Gesture Technologies sued Apple in the Western District of Texas, alleging that Apple infringed Gesture Technology's '924 patent, among others. The case was later transferred to California. In May 2021, Apple filed a petition with the Patent Trial and Appeal Board seeking inter partes review of all claims of the '924 patent. Appx92-172. Apple's petition demonstrated that independent claim 1, as well as most of the '924 patent's dependent claims, are invalid over the combination of Mann's dual-camera PDA or smartwatch and Numazaki's camera-controlled PDA or smartwatch. Appx99. Apple showed that the remaining dependent claims are obvious over Mann and Numazaki in further combination with either Amir or Aviv. Appx99.

For each of its obviousness combinations, Apple relied on Numazaki (and, in some dependent claims, Amir or Aviv) to teach the claimed camera-based gesture control functionality, while turning to Mann to teach the device's structure. Specifically, Mann's PDA and wristwatch embodiments taught "a handheld device comprising" "a housing," "a computer within the housing," and two cameras: one

14

"oriented to view a user" and the other "oriented to view an object other than the user." Appx118-130. Numazaki, on the other hand, taught "control … of the handheld device based on at least one of the first camera output and the second camera output." Appx131-135; *see also* Appx114 (noting that "Numazaki [also] describes PDA and wristwatch devices with cameras facing the user such that a user can perform gestures over the devices to exert control over the operation of the device."); Appx147-152 (Amir); Appx157-158 (Aviv). Put simply, Mann taught the claimed physical form factor and Numazaki taught the claimed functionality.

Apple further explained, supported by testimony from its expert Dr. Bederson, *see* Appx707-709, that a skilled artisan would have been motivated to implement Numazaki's "no touch" gesture control on Mann's dual-camera device. Mann's PDA and smartwatch "functionality and structure" are highly similar to Numazaki's, and implementing "no touch" gestures in place of Mann's existing touch-based gesture input would improve Mann's devices in several ways: it would avoid "obstructing" Mann's display, prevent getting "grease and grime" on the camera lens, and would improve one of the goals of

15

Mann's device, to enable discrete recordings.  Appx113-118 (citing Appx707-709).

In the petition, Apple also explained that each of Mann, Numazaki, Amir, and Aviv is analogous art to the '924 patent because each reference shares a field of endeavor with the patent.  Specifically, Apple explained that each of Mann, Numazaki, and the '924 patent "discloses a portable camera system that may be controlled by human gesture input."  Appx106; Appx110.  Amir is analogous art because, like the '924 patent, it "discloses a portable camera system that controls the operation of the device based on captured image information."  Appx142.  Aviv is analogous art because, like the '924 patent, it "discloses a camera system that controls the operation of the device based on captured image information."  Appx154.

Gesture Technology's preliminary response to Apple's petition argued that Apple's obviousness combinations did not teach the claimed optical-control techniques.  Appx195.  Gesture Technology did not dispute that Mann teaches the complete physical structure of the claimed device, and it did not dispute that the prior-art references were

in the same field of endeavor as the '924 patent or otherwise challenge their analogous art status.  *See generally* Appx195-218.

When the Board instituted inter partes review in December 2021, it took the same approach with respect to the analogous art issue. While it did not expressly address analogousness, it assessed Apple's obviousness grounds and found that, contrary to Gesture Technology's argument, Apple had established a reasonable likelihood of showing all claims invalid.  *See generally*, Appx219-244.  In doing so, it implicitly accepted each reference as analogous prior art.

Gesture Technology's Patent Owner Response briefly argued that Apple "failed to establish" that Mann and Aviv were analogous art because the petition did not explicitly identify a "field of endeavor," but rather showed analogousness by identifying a common focus to which both the patent and each reference is directed.  Appx283-285 (Mann); Appx294 (Aviv).  Gesture Technology asserted that Apple's approach of identifying common disclosures between each reference and the '924 patent was an "improper" way of showing that each reference was within the '924 patent's field of endeavor.  Appx284.  But Gesture Technology did not (1) offer any reason why Mann or Aviv should *not* be

deemed analogous, (2) identify any alternative "field of endeavor" for Mann, Aviv, or the '924 patent, or (3) dispute that Numazaki's field of endeavor was portable camera systems that may be controlled by human gesture input. Appx284; Appx257-299.

Apple's reply again addressed analogousness. It explained that the "[p]etition clearly define[d] the field of endeavor" to include "portable camera system[s] that may be controlled by human gesture input." Appx359. By identifying common disclosures between the patent and each reference, the petition was "defin[ing] [the] field of endeavor" according to the common disclosures. Appx359. Specifically, "Mann, Numazaki, and the '924 [p]atent are each directed to 'a portable camera system that may be controlled by human gesture input,'" and Aviv and Amir, like the '924 patent, are directed to "a camera system that controls the operation of the device based on captured image information." Appx359 (quoting Appx106; Appx110; Appx142; Appx154) (noting that Amir is also "portable").

Gesture Technology then filed a sur-reply that, among other things, expanded its analogous art argument to include a substantive discussion of Mann. Appx381-382. While the sur-reply still did not

identify any alternative field of endeavor for either Mann or the '924

patent, it suggested that Mann's focus on inconspicuous recording and

its integration with "handwritten notes" undercut Apple's showing that

Mann's field of endeavor was "a portable camera system that may be

controlled by human gesture input."  Appx381-382.  As to Amir (which

Gesture Technology had not mentioned at all in its prior analogousness

discussion) and Aviv, the sur-reply argued that Apple's analogous art

argument failed because the field of endeavor Apple identified for each

reference was not perfectly identical to the field of endeavor Apple

elsewhere identified for the '924 patent itself, namely "a portable

camera system that may be controlled by human gesture input."

Appx384; Appx386.  In making that argument, Gesture Technology did

not dispute Apple's articulation of the '924 patent's field of endeavor.

### *The Board finds that Apple's Mann prior art reference is not analogous art, and therefore upholds the challenged claims.*

Following an oral hearing, the Board issued a Final Written

Decision finding that Apple had not shown any of the claims

unpatentable on any of the asserted obviousness grounds.  Appx1-20.

The Board's decision rested solely on its finding that Mann was not

analogous art.  It reached no other issue.

According to the Board, Apple did not "satisf[y] its burden to show that Mann is analogous art to the '924 patent" for three reasons. First, in discussing the analogousness of the four prior art references, Apple supposedly articulated "contradictory positions" on the '924 patent's "field of endeavor." The Board found irreconcilable differences between the following phrases:

| | |
|---|---|
| "[A] portable camera system that may be controlled by human gesture input" | Appx106; Appx111 (describing '924 patent, Mann, and Numazaki) |
| "[A] portable camera system that controls the operation of the device based on captured image information" | Appx142 (describing '924 patent and Amir). |
| "[A] camera system that controls the operation of the device based on captured image information" | Appx154 (describing '924 patent and Aviv) |

Second, the Board found these articulations of the field of endeavor problematic because, it stated, "the asserted fields of endeavor with respect to Amir and Aviv do not cover Mann." Appx13. And third, the Board found that the "citations to the '924 patent" in Apple's analogousness discussion—the abstract and the specification's discussion of Figure 18—did not support "any of [Apple's] positions as to the field of endeavor." Appx14.

20

The Board then crafted its own description of the field of endeavor for the '924 patent, independent of Apple's proposal (and without Gesture Technology disputing Apple's proposal or offering an alternative). To do so, the Board looked to "[t]he parties' summaries of the '924 patent," then tried to identify a commonality across the highlighted disclosures. Appx15. The Board reasoned: "[i]f anything, camera based sensing of the input is the one feature that is present in all of the noted sections of the '924 patent and is highlighted by the parties." Appx15. On that basis, the Board concluded that "the '924 patent is directed to computer devices that optically sens[e] human input using one or more cameras," which "[i]mplicit[ly]" requires that "the human input is used to control the computer device." Appx15 (noting that "the proper field of endeavor of the '924 patent should include camera based sensing of the input") (internal punctuation omitted). Because Mann does not use optically-sensed human input to control its computer—it uses a touch screen—the Board found Mann was not analogous art. Appx15.

The Board did not give Apple a chance to respond to its new field of endeavor definition, even though Gesture Technology had never

21

disputed Apple's articulation of the field for the '924 patent itself. Having determined that Apple failed to show Mann was analogous art, the Board did not reach the merits of Apple's three obviousness grounds.  Appx16; Appx19.

## SUMMARY OF THE ARGUMENT

**I.A.**  Apple correctly identified the '924 patent's field of endeavor as "a camera system that may be controlled by human gesture input." The '924 patent's claimed embodiment, which is the focus of the field of endeavor inquiry, provides for exactly such a device.  And the patent's specification confirms that its goal is enhancing existing gestural controls through the addition of camera-based sensing.  While the Board is correct that Apple used slightly variable language to define the field of the '924 patent, those differences were complementary, not contradictory.  And the citations supporting Apple's argument appropriately focused on the claimed invention's depiction of gesture-based control.  Apple's articulation of the field is supported by the evidence.

**I.B.**  The Board's sua sponte articulation of the patent's field of endeavor is not supported by substantial evidence because it is

22

improperly limited to the patent's asserted point of novelty: camera-based control.  The '924 patent does not disclose camera-based control in isolation, but rather focuses on applying that technique to enhance the functionality of existing devices, systems, and contexts controlled by human gesture.  Limiting the field of endeavor to art that already uses camera-based control would unduly narrow that field to the patent's particular solution and inappropriately exclude references that the patent itself (and the examiner) treated as prior art.

**I.C.** Under the correct field of endeavor—camera systems controlled by human gesture input—there is no question that Mann is analogous.  Mann teaches a dual-camera system controlled by human gesture.

**II.** Apart from the merits of the Board's analogous art analysis, the Board ran afoul of the APA.  While Gesture Technology asserted that Apple's *references* were not within the identified field of endeavor, it did not question Apple's definition of the *'924 patent's* field.  By adopting a field of endeavor for the patent distinct from the one identified by Apple, which was undisputed by Gesture Technology, and

by not giving Apple any opportunity to respond to that new definition, the Board violated the APA.  Remand is required.

## STANDARD OF REVIEW

This Court "review[s] the Board's decisions under the Administrative Procedure Act (APA)."  *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1024 (Fed. Cir. 2017).  The Court must "hold unlawful and set aside" any findings or conclusions that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "without observance of procedure required by law;" or "unsupported by substantial evidence."  5 U.S.C. § 706(2).

Whether a reference is analogous art "is a factual question" reviewed for "substantial evidence."  *In re Bigio*, 381 F.3d 1320, 1324 (Fed. Cir. 2004).  Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir. 2000) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Misapplying the applicable law is a legal error reviewed de novo.  *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015).

24

# ARGUMENT

## I. The Board's Finding That Mann Is Non-Analogous Art Is Unsupported By Substantial Evidence.

In evaluating whether a patent is obvious over the prior art, a fact finder must assess the "scope and content of the prior art." *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). To qualify as "prior art" that can be used in an obviousness combination, a reference must be "analogous" to the claimed invention. *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1000-01 (Fed. Cir. 2016). A reference is "analogous" if it is either (1) "'from the same field of endeavor'" as the patent, or (2) "'reasonably pertinent to the particular problem with which the inventor is involved.'" *Id.*[2] The scope of analogous art must be construed "broadly." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010). A reference is only non-analogous if it is so "remote" that it cannot "be considered relevant prior art." *Old Town Canoe Co. v. Glenwa, Inc.*, 55 F. Appx. 918, 925 (Fed. Cir. 2003) (citing *In re Clay*, 966 F.2d 656, 658-59 (Fed. Cir. 1992)).

---

[2] These tests are alternatives; a reference need not satisfy both to be deemed analogous. *See Bigio*, 381 F.3d at 1325. Apple believes the field of endeavor test is a better fit for this situation and has proceeded on that basis.

Apple properly identified the '924 patent's field of endeavor as a "camera system that may be controlled by human gesture input." *E.g.* Appx106. That field of endeavor is supported by the '924 patent's consistent focus on using camera-based sensing to achieve the overall goal of controlling computers with human gestures, as well as by the patent's claimed embodiment, which is a camera system controlled by human gesture input. In limiting the patent's field of endeavor to devices that already use camera-based sensing, the Board legally erred by "limit[ing] [the field of endeavor] to the specific point of novelty" over the prior art. *Unwired Planet*, 841 F.3d at 1001. Furthermore, under the correct understanding of the field of endeavor, there is no question that Mann—which is within the field of camera systems controlled by human gesture input—constitutes analogous art. This Court should reverse the Board's analogous art finding and remand for consideration of Apple's obviousness grounds.

## A. The '924 patent's field of endeavor is a camera system controlled by human gesture input.

Courts determine a patent's "field of endeavor" with reference to the "embodiments, function, and structure of the claimed invention," as well as the "common sense likely to be exerted" by a skilled artisan in

looking for relevant art. *Bigio*, 381 F.3d at 1325-26. Here, Apple properly identified the '924 patent's field of endeavor as "camera system[s] that may be controlled by human gesture input." *E.g.*, Appx106; Appx359. This field is confirmed by the patent's consistent focus on enhancing existing gestural controls through the addition of camera-based sensing, as well as by the structure and function of the claimed device.

The '924 patent's stated "Field of Invention" provides that the inventor's goal was using "human positions or orientations" (i.e., gestures) as an "input … for computers." Appx45 2:7-19. It further focuses on human gesture input by noting that "[t]he invention" enables computers to use as "input[s]" camera data "concerning the location of parts of, or objects held by, a person or persons." Appx45 2:20-24. To be sure, Gesture Technology's supposedly novel way of achieving that goal involved capturing the human gesture using cameras, but a patent's field of endeavor is not limited to the inventor's particular solution. *See Unwired Planet*, 841 F.3d at 1001 (field of endeavor may not be "limited to the specific point of novelty"). Here, the point of the camera-based sensing is to allow use of human gesture as computer input.

27

The patent's focus on human gesture input is also reflected in the laundry list of "new applications" disclosed in the specification—all of which aim to control computers using human gesture, and most of which use camera-based sensing to either replace or enhance existing, non-image-based gestural inputs. These embodiments range from a "remote control" that responds to gesturing at the TV instead of pushing buttons on the remote, Appx55 21:60-22:2; Appx50 12:33, to a board that enables a "housewife" to control appliances by "point[ing]" to a control panel, "much like touching an icon on a conventional computer touch screen," Appx55 21:33-49. Such examples further buttress Apple's identification of the field as "camera systems that may be controlled by human gesture input." Appx106.

While gesture-based control is the common goal across the '924 patent's wide-ranging specification, it is especially clear in the section describing the operation of the claimed device. *Unwired Planet*, 841 F.3d at 1001 (explaining that the field of endeavor must be assessed with reference to the "claimed invention"). The '924 claims recite a handheld device with two cameras, one facing the user, one facing out, that "perform[s] a control function of the handheld device based on …

28

camera output." Appx57 26:54-65.  The specification—particularly

Figure 18 and its corresponding description—describes the claimed

device operating within the broad field of endeavor of "camera system[s]

that may be controlled by human gesture input," just as Apple argued.

Specifically, the camera facing the user can capture "one[']s

fingers" to allow "conversing with the computer in a form of sign

language which can replace the keyboard of a conventional computer."

Appx57 25:54-57.  It can also capture the movement of "a pencil or pen"

"in one[']s hand" and use that input to provide the same functionality as

"a special touch screen and pencil." Appx57 25:58-60.  The camera

facing the other direction can "see gestures of others, as well as the

user," Appx57 26:25-26, and may also enable the user to select "icons"

on an external screen by "point[ing]" (in other words, gesturing) with

the handheld device itself.  Appx57 26:16-20.  Both cameras together

enable the user to "wave the handheld unit around while still inputting

accurate data to the display using one[']s fingers, objects or whatever."

Appx57 26:40-43.  In short, the claimed invention—like all the other

embodiments described in the '924 specification—"obtain[s] images" of

"[o]ne[']s gestures" so that the gestures can be used to control computers.  Appx57 25:50-63.

These disclosures make clear that the claimed invention—like the rest of the '924 specification—is aimed at using human gestures to control computers.  It is therefore within the broad field of "camera system[s] that may be controlled by human gesture input," just as Apple argued.

None of the Board's criticisms undercut Apple's identification of "camera system[s] that may be controlled by human gesture input" as the patent's proper field of endeavor.  The Board's primary complaint was that Apple offered supposedly "competing" articulations of the patent's field in the context of different prior art references.  Appx12-13.  Apple's articulations are set out below:

| "[A] portable camera system that may be controlled by human gesture input" | Appx106; Appx111 (describing '924 patent, Mann, and Numazaki) |
| "[A] portable camera system that controls the operation of the device based on captured image information" | Appx142 (describing '924 patent and Amir). |
| "[A] camera system that controls the operation of the device based on captured image information" | Appx154 (describing '924 patent and Aviv) |

As Apple's counsel explained at the hearing, the "slightly different language" was simply meant "to draw out the similarities between our prior art and the '924 patent." Appx447. Specifically, it was meant to illustrate that Aviv and Amir "control[] the operation of the device based on captured image information"—captured images of human gestures in particular—which is an additional point of commonality between those references and the '924 patent relevant to Apple's obviousness combinations. Appx142; Appx154. And it was meant to illustrate that Mann, Numazaki, and Amir are "portable" camera systems, just like the claimed device. Appx106; Appx110; Appx142.

Apple was entirely correct—indeed, required—to make that comparison between the prior art and the '924 patent. This Court has "consistently held that a patent challenger must compare the reference to the challenged patent." *Sanofi-Aventis Deutschland GmbH v. Mylan Pharms. Inc.*, 66 F.4th 1373, 1377 (Fed. Cir. 2023). It therefore would have been improper to compare Amir or Aviv to Mann as the Board suggested, because "[e]ven if a reference is analogous to one problem considered in another reference, it does not necessarily follow that the reference would be analogous to the problems of the challenged patent."

31

*Id.* at 1378. There was therefore no reason to reject Apple's articulation of the field of endeavor based on the contention that "the asserted fields of endeavor with respect to Amir and Aviv do not cover Mann." Appx13.

Moreover, the Board's overly rigid approach ignored that a patent's field of endeavor can encompass references focused on different "specific field[s]"—as in *Bigio*, where this Court agreed that a toothbrush reference and a patent within the "specific field" of hairbrushes are both within the broader field of brushes. *Bigio*, 381 F.3d at 1325-26. Accordingly, Apple highlighted Aviv and Amir's camera-based control, but made clear with the immediately subsequent description of Aviv's "gesture recognition," Appx154, and Amir's "pupil-mapping detection input," Appx143, that those references are also within the broader field of endeavor identified with respect to Mann and Numazaki: "camera system[s] that may be controlled by human gesture input." Similarly, Apple highlighted that Mann, Numazaki, Amir, and the '924 patent's claimed embodiment provide for "portable camera system[s]," but did not suggest that being "portable" took those references (or the '924 patent) out of the broader field of "camera system[s]" shared by Aviv. Appx106; Appx110; Appx142; Appx154.

32

Language emphasizing a reference's particular "area[] of focus" does not
undercut a showing that it is "within the broader field [of endeavor]."
*See Unwired Planet,* 841 F.3d at 1001 (holding user-interface design
manual was in the same field of endeavor as a patent claiming
interfaces for location-based services).

The Board also complained that the citations to the patent in
Apple's analogous art argument—the specification's description of
Figure 18 and the patent's abstract—do not support Apple's identified
field of endeavor.  Appx13-14.  The Board was wrong.  Both the abstract
and the cited portion of the specification recite a camera system.
Appx57 25:40-41 (a "hand held computer … incorporating a camera");
Appx21 ("camera and computer based sensing in many practical
applications, including… handheld devices").  And, as explained above
(at 28-29), the cited portion of the specification goes on to describe
control by human gesture input.  Specifically, it provides that
"conventional" gesture inputs like "a special touch screen and pencil" or
typing on a "keyboard" can be replaced or supplemented by optically-
sensed gesture inputs, like "tracking" the "pencil itself" or capturing
images of "[o]ne[']s fingers" to "convers[e] with the computer in a form of

33

sign language." Appx57 25:50-63. Apple's citations support identifying the '924 patent's field of endeavor as "a camera system that may be controlled by human gesture input."

**B. The Board erred in finding that the '924 patent's field of endeavor is limited to devices that optically sense human inputs, because that narrow field of endeavor is the purported point of novelty.**

After rejecting Apple's proposed field of endeavor, and without any competing field of endeavor proposed by Gesture Technology, the Board crafted its own. Looking primarily to the parties' summaries of the patent's wide-ranging disclosure, the Board explained that "[i]f anything, camera based sensing of the input is the one feature that is present in all of the noted sections of the '924 patent and is highlighted by the parties." Appx15. On the basis of that least-common denominator, the Board concluded that the patent's field of endeavor was "computer devices" that use "optically sens[ed] human input" to control the device. Appx15. In so finding, the Board committed a legal error in improperly limiting "[t]he field of endeavor … to the specific point of novelty" over prior art. *Unwired Planet,* 841 F.3d at 1001.

As noted above (at 27-29), the '924 patent focuses on enhancing existing devices and systems controlled by human gesture—say, a

34

device controlled by pressing on a touch screen or a car dashboard controlled by manipulating physical knobs—by adding camera-based sensing of the human movement. *E.g.*, Appx51 14:18-20, 43-54; Appx55 21:34-49. In the claimed embodiment of Figure 18, camera-based sensing is used to directly replace prior, non-camera-based control techniques, such as "an ordinary stylus" or "keyboard of a conventional computer." Appx57 25:54-62. The patent elsewhere suggests adding camera-based control capabilities to "a handheld device which itself has functions (for example, a cell phone)." Appx50 11:65-66, 12:32-34; *see also* Appx55 21:62-65 ("a TV remote control"). The patent says doing so will "add functionality to the device *without* complicating its base functions"—that is, its ability to operate like a normal cell phone or remote control. Appx50 11:67-12:3. "The basic idea here is that a device which one holds in one[']s hand for use in its own right, can also be used with the invention herein to perform a control function." Appx50 12:4-7.

Given the patent's consistent focus on using camera-based sensing to enhance existing devices and systems, including through one-to-one replacement of non-camera-based controls, it makes no sense to find

that the field of endeavor is limited to art that *already* uses camera-based sensing.  Indeed, the Board's approach leads to the absurd conclusion that existing components described in the specification itself as prior art—"such as hand held cell phones, dictation units, telephones, wearable computer devices and the like"—are not within the patent's field of endeavor.  *E.g.*, Appx51 13:25-29.

The Board's field of endeavor also excludes references the Examiner considered as prior art—including a camera reference that, like Mann, taught the physical structure of the claimed device, but did not itself include camera-based control.  *See* Appx609-614 (relying on the "Silverbrook" reference, U.S. Patent No. 6,788,336, which is a handheld camera device, much like Mann, with two cameras and a housing).  In *Regent Lighting Corp. v. FL Indus., Inc.*, this Court reversed a district court's overly narrow field of endeavor on precisely this basis, explaining that, when the "examiner[] reli[ed] on … an indoor fluorescent lighting fixture" as prior art, it was improper to limit the field of endeavor to "outdoor quartz halogen floodlights."  No. 94-1162, 1995 WL 331122 at *4.  (Fed. Cir. June 2, 1995) (non-precedential).  Indeed, the prosecution history shows that even the

36

inventor did not regard the field as limited to camera-based control:

Gesture Technology overcame an initial obviousness rejection based on

the art described above by amending the claims to require camera-

based control of the device.  Appx630.  In restricting the field of

endeavor to that camera-based control, the Board committed legal error

by narrowing the field to "the specific point of novelty."  *Unwired

Planet*, 841 F.3d at 1001.

Moreover, the Board's analytical approach—looking at the

patent's disclosure and then finding "the one feature that is present in

all … the noted sections," Appx15—leads to absurd results in the

context of a patent (like this one) that discloses a wide range of devices

and systems, only some of which are claimed.  It leads to specifications

with *broader* disclosures being assigned *narrower* fields of endeavor,

when the Court has consistently recognized that the opposite should be

true.  In *In re Mettke*, for instance, the Court held that the field of

endeavor may not be limited to internet terminals, as argued by

patentee, when the specification described using the supposedly novel

pay-as-you-go technique with fax machines, telephones, televisions,

cellular phones, and global positioning systems.  570 F.3d 1356, 1359

37

(Fed. Cir. 2009). Here, too, the incredible variability and breadth of the '924 patent's specification should make the relevant field of endeavor broader, not narrower. At the very least, the Board should have recognized that human gesture is just as much a common denominator of the patent's disclosure as the camera-based control.

Given the '924 patent's focus on using the optical-control technique to supplement and build on existing devices "without complicating [the] base function" of such devices, Appx50 12:1-3, the Board erred by limiting the field of endeavor to art that already uses that technique, while excluding art like Mann that teaches the existing devices and systems in which the technique may be applied. As this Court recognized in *Bigio*, the field of endeavor should not be limited to a "specific field" if "structural similarities" or other factors would lead a skilled artisan "working in the specific field" to consider other art. 381 F.3d at 1325-26. In *Bigio*'s case, that meant the field of endeavor for a hairbrush patent could not be limited to brushes intended for hair, because "structural similarities" would lead a skilled artisan "working in the specific field of hairbrushes to consider all similar brushes including toothbrushes." *Id*. Likewise here, the '924 patent's "specific

field" may be the camera-based sensing techniques—but, given its focus on using that technique to enhance existing forms of gesture-based input, it is still part of the larger field of "camera systems that may be controlled by human gesture input."

The Board's narrowed field is both legally wrong and unsupported by substantial evidence.

## C.    Applying the patent's correct field of endeavor, Mann is analogous art.

Under the patent's correct field of endeavor, there is no question that Mann is analogous art.  Mann teaches a "hand-held portable electronic camera system" with two cameras: one facing out, to "capture[] a view of a person standing in front of the user," and one facing up, so the user can "make a video recording of himself/herself while [also] recording another person."  Appx783-784; Appx796; Appx798; Appx773.  Mann also teaches that its device may be controlled by human gesture.  Specifically, the wristwatch embodiments may be controlled by swiping a finger in different directions across the face of the watch.  Appx785-787; Appx695-698.  And the PDA embodiment may be controlled by writing (which is a form of human gesture) on the device with an electronic pen.  Appx785; Appx698.  Thus, Mann is

39

squarely within the '924 patent's field of endeavor: "camera systems that may be controlled by human gesture input."

In its sur-reply, Gesture Technology argued that placing Mann within this field of endeavor does not appropriately consider "all of the embodiments and [the] claims" of Mann.  Appx381-382.  But Gesture Technology did not posit any alternative field of endeavor for Mann, and it is unclear what embodiment or claim Gesture Technology feels was ignored.  All of Mann's claims provide for a camera system, and claims 6-9, 10-11, and 19-24 additionally provide for controlling the device using human gesture input.  Appx791-794.  The only other embodiment is a "clipboard," which works just like the PDA, except the notetaking is done with "a combined electronic pen and real pen" writing on paper, not a stylus on a screen.  Appx784-785.

To the extent Gesture Technology is suggesting that Mann's field of endeavor is limited to devices intended for inconspicuous recording, *see* Appx381, this Court has rejected similar purpose-centric approaches.  In *State Contracting & Engineering Corp. v. Condotte America*, this Court concluded that a book about "slurry wall art" was within the scope of endeavor of a patent directed to a wall construction

technique even though the book's "title … and most of the teachings" focused on a different technique than the patent. 346 F.3d 1057, 1069-70 (Fed. Cir. 2003) (vacating and remanding for further consideration of analogousness). The Court explained that "[t]he relevant part" of the book addressed the claimed wall construction technique, and the fact that the book "also describes the formation of slurry walls" does not "negate its teaching" of the wall construction approach. *Id.* at 1070. Similarly, this Court recognized in *Bigio* that toothbrushes and hairbrushes are within the same field of endeavor because they share the same "structure" and "function," regardless of what they are intended to brush. 381 F.3d at 1325-26.

Here, the fact that Mann is intended for "investigative documentary videos," Appx775, does not negate its teaching of a two-camera handheld device controlled by human gesture input. Because Mann is within the properly defined field of endeavor, it is analogous to the '924 patent and constitutes prior art.

41

## II.    The Board Violated The APA By Articulating An Entirely New Field Of Endeavor Without Giving Apple An Opportunity To Respond.

The Administrative Procedure Act generally requires "the Board [to] base its decision on arguments that were advanced by a party, and to which the opposing party was given a chance to respond." *In re IPR Licensing, Inc.*, 942 F.3d 1363, 1368-69 (Fed. Cir. 2019).  In limited circumstances the Board may address arguments not raised by the parties, but to do so it must "give[] the parties notice and an opportunity to respond." *Nike, Inc. v. Adidas AG*, 955 F.3d 45, 53 (Fed. Cir. 2020).  These process requirements, which apply to the Board's treatment of both petitioners and patent owners, ensure that agency decisions are fair and well-reasoned.  *See SAS Inst., Inc. v. ComplementSoft, LLC.*, 825 F.3d 1341, 1351 (Fed. Cir. 2016), *rev'd and remanded on other grounds sub nom., SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018).  The Board ran afoul of those principles here by narrowing the patent's field of endeavor to require camera-based sensing, even though Gesture Technology never contested Apple's identification of a broader field of endeavor with respect to the patent itself.

42

Gesture Technology asserted that Mann was non-analogous, but it did not question the field of endeavor Apple identified for the '924 patent. The Patent Owner response argued that Apple "failed to establish" that Mann and Aviv were analogous art to the '924 patent because (according to Gesture Technology) the petition did not explicitly identify a "field of endeavor." Appx283-285; Appx294. Gesture Technology declined to propose any alternative field of endeavor, nor did it contest that both Numazaki and the '924 patent fell within the field of endeavor of "a portable camera system that may be controlled by human gesture input."

After Apple further clarified on reply that the petition had defined the field of endeavor as encompassing "portable camera system[s] that may be controlled by human gesture input," Gesture Technology's sur-reply argued that Mann was not in the field of "a portable camera system that may be controlled by human gesture input." Appx381-382. But Gesture Technology did not dispute that the '924 patent and Numazaki are within that field. In fact, it implicitly *agreed* that the '924 patent is in that field by arguing that Mann, Aviv, and Amir are not. As to Aviv and Amir, Gesture Technology simply argued that,

43

because Apple had used slightly different terminology in describing the field of those references, they "do[] not belong to the same field of endeavor as the '924 patent." Appx384.

The same approach continued at the hearing. Gesture Technology argued that the references were not within the field of endeavor Apple articulated for the patent, but did not dispute that the patent is in that field. Appx464-465. Apple repeatedly flagged that Gesture Technology did not offer any "competing field of endeavor." Appx444; Appx446. And while ALJ Dougal noted that it did not "seem consistent" to offer variable articulations of the patent's field of endeavor, there was never any indication that the Board would reject Apple's articulation of the patent's field altogether and craft its own. Appx444-448.

In the Final Written Decision, the Board faulted Apple for not "provid[ing] … additional analysis as to why the identified field of endeavor is correct or supported by the '924 patent or Mann" in response to Gesture Technology's analogousness arguments. Appx13. But, at least as to the field of endeavor of the '924 patent, Apple had no occasion to provide that analysis; Gesture Technology never argued that the identified field of endeavor was incorrect. Nevertheless, the Board

44

rejected Apple's approach and crafted an entirely new field of endeavor based on the parties' descriptions of the patent in other aspects of their briefing. Appx15. While the Board framed its field of endeavor as "agree[ing] with the parties," Appx15, neither party defined the field in the way the Board did, nor did either party adopt the Board's perspective in addressing the issue of analogousness.

If the Board believed that the field of endeavor identified by Apple and accepted by Gesture Technology was incorrect, the proper course of action was to provide the parties with advance notice of the Board's concern, along with an opportunity to respond. *See, e.g.*, *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1263 (Fed. Cir. 2021) (the Board should have given notice to the parties before diverging from agreed-upon matter of claim construction). The Board did not do so. That failure requires a remand. *See id.* at 1262-63.

## CONCLUSION

For at least these reasons, this Court should reverse the Board's analogous art finding, vacate the Board's determination that Apple failed to establish the obviousness of the challenged claims, and remand for consideration of Apple's obviousness grounds.

Respectfully submitted,

*/s/Abigail Colella*

Paul R. Hart
ERISE IP, P.A.
5299 DTC Blvd.
Suite 1340
Greenwood Village, CO 80111

Adam P. Seitz
Clifford T. Brazen
ERISE IP, P.A.
7015 College Blvd.
Suite 700
Overland Park, KS 66211

Abigail Colella
Melanie L. Bostwick
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
1152 15th Street NW
Washington, DC 20005
(202) 339-8400

Elizabeth R. Moulton
ORRICK, HERRINGTON &
    SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

*Counsel for Appellant Apple Inc.*

August 3, 2023

# ADDENDUM

Final Written Decision,
 Paper No. 27 filed December 2, 2022 ......................................... Appx1

U.S. Patent No. 8,194,924 ............................................................ Appx21

Trials@uspto.gov                                        Paper 27
571-272-7822                              Entered: December 2, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE, INC., LG ELECTRONICS, INC.,
LG ELECTRONICS U.S.A., INC., and GOOGLE LLC,
Petitioner,

v.

GESTURE TECHNOLOGY PARTNERS, LLC,
Patent Owner.

———————————

IPR2021-00923[1]
Patent 8,194,924 B2

———————————

Before PATRICK R. SCANLON, BRENT M. DOUGAL, and
SCOTT RAEVSKY, *Administrative Patent Judges.*

DOUGAL, *Administrative Patent Judge.*


JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

———————

[1] IPR2022-00093 (LG Electronics, Inc. and LG Electronics U.S.A., Inc.) and
IPR2022-00361 (Google LLC) have been joined with this proceeding.

IPR2021-00923
Patent 8,194,924 B2

# I.  INTRODUCTION

## A.  *Background and Summary*

Applying the standard set forth in 35 U.S.C. § 314(a), we instituted an *inter partes* review challenging the patentability of claims 1–14 ("the challenged claims") of U.S. Patent 8,194,924 B2 (Ex. 1001, "the '924 patent"). Paper 10 ("Decision" or "Dec."). Apple Inc., filed the request for an *inter partes* review (Paper 1, "Petition" or "Pet."), which Patent Owner, Gesture Technology Partners, LLC, opposed (Paper 8). We subsequently granted requests filed by LG Electronics, Inc., LG Electronics U.S.A., Inc., and Google LLC to join this proceeding as a petitioner.[2] Papers 13, 15.

After institution, Patent Owner filed a Response (Paper 12, "PO Resp."), Petitioner filed a Reply (Paper 17, "Reply"), and Patent Owner filed a Sur-reply (Paper 18, "Sur-reply"). An oral hearing was held on September 14, 2022, and a copy of the transcript is in the record. Paper 26 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Decision is a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 as to the patentability of the claims on trial. Having reviewed the arguments of the parties and the supporting evidence, we determine that Petitioner has not shown by a preponderance of the evidence that claims 1–14 are unpatentable.

## B.  *Related Matters*

The following are identified as related District Court cases: *Gesture Technology Partners, LLC v. Huawei Device Co., Ltd.*, No. 2:21-cv-00040 (E.D. Tex.); *Gesture Technology Partners, LLC v. Samsung Electronics Co.*,

---

[2] Apple Inc., LG Electronics, Inc., LG Electronics U.S.A., Inc., and Google LLC are referred to collectively hereinafter as "Petitioner."

IPR2021-00923
Patent 8,194,924 B2

No. 2:21-cv-00041 (E.D. Tex.); *Gesture Technology Partners, LLC v. Apple Inc.*, No. 6:21-cv-00121 (W.D. Tex.); *Gesture Technology Partners, LLC v. Lenovo Group Ltd.*, No. 6:21-cv-00122 (W.D. Tex.); *Gesture Technology Partners, LLC v. LG Electronics, Inc.*, No. 6:21-cv-00123 (W.D. Tex.); *Gesture Technology Partners, LLC v. Motorola Mobility LLC*, No. 1:22-cv03535 (N.D. Ill); and *Gesture Technology Partners, LLC v. Katherine K. Vidal*, No. No. 1:22-cv-622 (E.D. VA). Paper 19, 1–3. Patent Owner identifies these related Board proceedings: IPR2021-00917; IPR2021-00920; IPR2021-00921; and IPR2021-00922. Paper 6, 2. Patent Owner identifies these related *Ex Parte* Reexaminations: No. 90/014,900; No. 90/014,901; No. 90/014,902; and No. 90/014,903. Paper 19, 3–4.

## C. The '924 Patent

The '924 patent is entitled "Camera Based Sensing in Handheld, Mobile, Gaming or Other Devices." Ex. 1001, code (54). The '924 patent "relates to simple input devices for computers, . . . and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations." *Id.* at 2:7–11. In general, the '924 patent discloses numerous applications in which a user or an object held by a user can control a computer with one or more cameras as depicted in Figure 1A below.

IPR2021-00923
Patent 8,194,924 B2



**FIG. 1A**

Figure 1A shows "a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use." *Id.* at 3:19–23. As shown, there are multiple cameras (100, 101, 144) located on a monitor (102) with a screen (103) facing a user and connected to a computer (106). *Id.* at 3:27–57.

The '924 patent discloses a handheld computer with multiple cameras (1902, 1910) depicted in Figure 18 below. *Id.* at 25:40–45.



Fig. 18

4

IPR2021-00923
Patent 8,194,924 B2

As illustrated in Figure 18, a handheld computer (1901) with central
processing unit (CPU) houses a camera (1902) that can be paired in stereo
with another camera (1910), either of which may rotate about an axis to
view a user or aspect of that user like a finger (1906). *Id.* at 25:40–43. When
aimed at the user, the camera(s) can be used to obtain images and video
images of a user's fingers, hand, objects in the hand, gestures, and facial
expressions. *Id.* at 25:50–63. Facing one or more of the cameras away from
the user, they "can also be used to see gestures of others." *Id*. at 26:25.

### D.  Illustrative Claim

Petitioner challenges claims 1–14 of the '924 patent. Claim 1 is the
sole independent claim and is illustrative:

> 1. A handheld device comprising:
>
> a housing;
>
> a computer within the housing;
>
> a first camera oriented to view a user of the handheld
> device and having a first camera output; and
>
> a second camera oriented to view an object other than the
> user of the device and having a second camera output, wherein
> the first and second cameras include non-overlapping fields of
> view, and wherein the computer is adapted to perform a control
> function of the handheld device based on at least one of the first
> camera output and the second camera output.

Ex. 1001, 26:54–65.

## II.  ANALYSIS

### A.  Summary of Issues

In the below analysis, we first address the grounds of unpatentability.
We then address Patent Owner's jurisdiction argument.

IPR2021-00923
Patent 8,194,924 B2

B.  *Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability (Pet. 6),

supported by the declaration of Benjamin B. Bederson (Ex. 1003):

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–6, 11, 14 | 103(a)[3] | Mann,[4] Numazaki[5] |
| 7, 8, 10, 12, 13 | 103(a) | Mann, Numazaki, Amir[6] |
| 6, 9 | 103(a) | Mann, Numazaki, Aviv[7] |

1.  *Legal Standards for Unpatentability*

Petitioner bears the burden to demonstrate unpatentability. *Dynamic*

*Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir.

2015).

A claim is unpatentable as obvious under 35 U.S.C. § 103 if "the

differences between the subject matter sought to be patented and the prior art

are such that the subject matter as a whole would have been obvious at the

time the invention was made to a person having ordinary skill in the art to

which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S.

398, 406 (2007) (quoting 35 U.S.C. § 103(a)). We resolve the question of

obviousness based on underlying factual determinations, including: (1) the

scope and content of the prior art; (2) any differences between the prior art

and the claims; (3) the level of skill in the art; and (4) when in evidence,

---

[3]  The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125
Stat. 284, 285–88 (2011), revised 35 U.S.C. § 103 effective March 16, 2013.
Because the challenged patent claims priority before March 16, 2013, we
refer to the pre-AIA versions.
[4] Canadian Published Patent Application 2,237,939, published Aug. 28,
1998 ("Mann") (Ex. 1004).
[5]  U.S. Patent 6,144,366, issued Nov. 7, 2000 ("Numazaki") (Ex. 1005).
[6]  U.S. Patent 6,539,100 B1, issued Mar. 25, 2003 ("Amir") (Ex. 1006).
[7]  U.S. Patent 5,666,157, issued Sept. 9, 1997 ("Aviv") (Ex. 1007).

IPR2021-00923
Patent 8,194,924 B2

objective indicia of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

We apply these principles to the Petition's challenges.

### 2. *Level of Ordinary Skill in the Art*

Petitioner asserts that "[a] person having ordinary skill in the art ('PHOSITA') at the time of the '924 Patent would have had at least a bachelor's degree in electrical engineering or equivalent with at least one year of experience in the field of human computer interaction" and that "[a]dditional education or experience might substitute for the above requirements." Pet. 5 (citing Ex. 1003 ¶¶ 29–31). Patent Owner does not dispute Petitioner's level of ordinary skill in the art. PO Resp. 7.

We are persuaded, on the present record, that Petitioner's declarant's statement is consistent with the problems and solutions in the '924 patent and prior art of record. We adopt this definition for the purposes of this Decision.

### 3. *Obviousness over Mann and Numazaki*

Petitioner argues that the combination of Mann and Numazaki would have rendered obvious claims 1–6, 11, and 14. Pet. 7–49. Patent Owner provides a number of different arguments contesting the combination of Mann and Numazaki. PO Resp. 7–29.

We first give an overview of Mann. This is followed by a summary of Petitioner's position and Patent Owner's argument that Petitioner fails to establish that Mann is analogous art to the '924 patent.

### a) *Mann*

Mann is directed to "a personal camera with viewfinder means and a personal video annotation system." Ex. 1004, Abstract. Mann states that

IPR2021-00923
Patent 8,194,924 B2

"[t]he camera system integrates the process of making a personal handwritten diary or the like, with the capture of video." *Id.*

    Figure 1 depicts an embodiment with "a camera borne by a personal digital assistant (PDA)." *Id.* at 10.



As shown in Figure 1, the PDA includes a video camera (110), an auxiliary screen (120) for displaying the image captured by the video camera, a screen for notetaking (130), and a pen (140). *Id.* at 11–12. Mann teaches that the PDA can optionally include a second camera (150) "if the user wishes to make a video recording of himself/herself while recording another person with camera 110," so as to record "both sides of the conversation." *Id.* at 12. The PDA is connected, via wire (160) that may "run up the sleeve of the user" to a separate body worn pack (170). *Id.* The body pack includes a

IPR2021-00923
Patent 8,194,924 B2

battery pack (172), a computer system (174), and a communications system (176). The communications system contains a "packet radio terminal node controller (high level data link controller with modem) and radio, which typically establishes an Internet connection by way of antenna 178." *Id.*

Mann also teaches a "wristwatch embodiment 300 of the invention depicted in Fig[ure] 1," which is shown in Figure 3. *Id.* at 13. A detail view of Figure 3 is reproduced below, where the separate body worn pack (170) is not fully depicted, as it is identical to that shown in Figure 1.



In the detail view of Figure 3 above, a wristwatch (300) is illustrated which houses a first camera (310) pointed to record another person from the wearer and a second camera (350) to record the wristwatch wearer interviewing the other person. *Id.* The wristwatch also includes a viewfinder in the form of an auxiliary screen (320) which shows what the first camera is seeing. *Id.* As in the prior embodiment, cabling runs to the separate body worn pack (170) which includes a battery pack (172), a computer system

(174), and a communications system (176). In this way the "video from camera 310 may be transmitted and recorded at remote sites, while the wearer of the wristwatch may be advised by a remote legal expert on the best approach for dealing with the corrupt or disrespectful official." *Id.* at 13–14. Mann teaches that "[i]nteraction with the wristwatch version of the invention . . . may be done through a pen-based or touch-based interface to the screen." *Id.* at 14.

### b) General Overview of Petitioner's Position for Claim 1

Petitioner relies on two different combinations of Mann and Numazaki for teaching or suggesting all of the elements of claim 1. Pet. 18–42. Petitioner combines the PDA shown in Mann's Figure 1 with aspects of the compact portable information device shown in Numazaki's Figure 78. *Id.* Petitioner alternatively combines Mann's wristwatch shown in Figure 3, with aspects of Numazaki's wristwatch shown in Figure 79. Petitioner appears to be arguing that though the form factors are different (PDA v. wristwatch), the disclosed hardware and functionality are essentially the same. Petitioner further appears to be arguing that, at least with respect to claim 1, either combination satisfies all limitations.

### c) Analogous Art

Patent Owner argues that "Petitioner has failed to establish that *Mann* is analogous art [to the '924 patent] and thus *Mann* cannot be used in an obviousness rejection." PO Resp. 23.

A reference qualifies as prior art for an obviousness determination only when it is analogous to the claimed invention. *See In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011). The Federal Circuit has laid out two separate tests to determine whether a reference is analogous art to the claimed invention, i.e., whether one of ordinary skill in the art would even look to the

IPR2021-00923
Patent 8,194,924 B2

teachings of that reference. *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004). They are: "(1) whether the art is from the same field of [the inventor's] endeavor" and "(2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved." *Id.*; *see also In re Klein*, 647 F.3d at 1348.

Petitioner only addresses the first test ("field of endeavor") and has thus waived any arguments related to the second test ("reasonably pertinent to the particular problem").

The Petition alleges that

> Because *Mann*, like the '924 Patent, discloses a portable camera system that may be controlled by human gesture input, *Mann* is in the same field of endeavor as the '924 Patent. *Compare Mann* (Ex. 1004), 1 (describing a "new photographic or video means and apparatus typically comprising a hand-held portable electronic camera system with viewfinder means and electronic pen-based annotation means" in the form of a PDA and wristwatch with a touch-based interface screen), 11, 12, 14 (describing clock face gestures used to control device) *with '924 Patent* (Ex 1001), Abstract, 25:40-41, 25:50-63 (describing a "[m]ethod and apparatus . . . to enable rapid TV camera and computer based sensing in . . . handheld devices" used to detect a user's fingers and gestures)).

*Id.* at 13 (alterations in original).

The Petition does not expressly define the field of endeavor of either the '924 patent or Mann. Rather, the Petition takes the approach that because there is overlap in a general category of disclosure, "a portable camera system that may be controlled by human gesture input," Mann and the '924 patent are "in the same field of endeavor." PO Resp. 24.

Because of this unique approach, the Petition when discussing the prior art references Amir and Aviv in the later obviousness grounds,

IPR2021-00923
Patent 8,194,924 B2

characterizes the disclosure differently: "the '924 Patent, discloses a portable camera system that controls the operation of the device based on captured image information," and "the '924 Patent, discloses a camera system that controls the operation of the device based on captured image information" Pet. 49–50, 61 (citing Ex 1001, Abstr., 25:40–41, 25:50–63). Though these characterizations are similar, one requires a "portable" camera system, and the other is merely a "camera system."

In response to Patent Owner's arguments, Petitioner simply states that these cited disclosures are the fields of endeavor. Reply 24. Petitioner's Reply provides no further explanation or discussion. *See id.* For example, Petitioner does not explain why it is appropriate to determine that the same cited disclosures in the '924 patent (Ex 1001, Abstr., 25:40–41, 25:50–63) define different fields of endeavor as Petitioner now asserts.[8] Petitioner also does not acknowledge that the Petition's characterizations of the disclosure of the '924 patent with relation to Amir and Aviv does not cover Mann. Mann does not "disclose[] a camera system that controls the operation of the device based on captured image information." *See* Ex. 1004; *see also* Pet. 13 (citing Ex. 1004, 1, 11, 12, 14 as teaching pen-based and touch-based inputs).

At the hearing, Petitioner characterized the asserted field of endeavor with relation to Amir and Aviv as "slightly broader" than that discussed with respect to Mann, and stated that they are not competing. Tr. 24. However, this is not the case. Petitioner's asserted field of endeavor covering Mann does not require that the human gesture input be "captured image

---

[8] During the hearing, Petitioner acknowledged that this is not consistent with common practice. Tr. 23–24.

IPR2021-00923
Patent 8,194,924 B2

information" as it does for Amir and Aviv. On the other hand, if the field of endeavor of "a portable camera system that may be controlled by human gesture input" requires that the human gesture input be "captured image information," then the field of endeavor does not cover Mann for the reason discussed above.

We find that Petitioner has not satisfied its burden to show that Mann is analogous art to the '924 patent. As noted above, Petitioner waived all arguments related to the question of "reasonably pertinent to the particular problem" and only addresses the "field of endeavor." Though it may be sufficient to provide no or minimal analysis in the Petition concerning analogous art, including field of endeavor (*see e.g.*, IPR2021-00564, Paper 58, 24–25), Petitioner's Reply did not provide any additional analysis as to why the identified field of endeavor is correct or supported by the '924 patent or Mann (*see* Reply 24). Rather, Petitioner merely asserts that its different characterizations of the disclosure of the '924 patent are the field of endeavor for the '924 patent. *Id.* As noted above, the asserted fields of endeavor with respect to Amir and Aviv do not cover Mann.

Petitioner provides no analysis as to why it is appropriate to have different fields of endeavor all based on the same disclosure. For example, the Petition takes the contradictory positions that the cited portions of the '924 patent teach that the field of endeavor may or may not require "control[ of] the operation of the device based on captured image information." In addition, the Petition takes the contradictory positions that the cited portions of the '924 patent teach that the field of endeavor may or may not require "human gesture input."

Of the three citations to the '924 patent relied on by Petitioner (Pet. 13 (citing Ex 1001, Abstr., 25:40–41, 25:50–63)), none support Petitioner's

13

IPR2021-00923
Patent 8,194,924 B2

position as to the field of endeavor of the '924 patent—the Abstract refers to camera based sensing, 25:40–41 says a handheld computer includes a camera, and 25:50–63 describes a camera obtaining an image of many things, including gestures. None of these citations describe controlling a portable camera system by human gesture input. None of these citations describe controlling a camera system based on captured image information. Thus, even if any of Petitioner's positions as to the field of endeavor of the '924 patent were correct, Petitioner provides no citations to the '924 patent that support its position.

For these reasons, Petitioner has not satisfied its burden to show that Mann is analogous art to the '924 patent.

Further, we determine that Petitioner's identified field of endeavor for the '924 patent and Mann ("a portable camera system that may be controlled by human gesture input") is incorrect. Pet. 13.

We find the evidence of record from both Petitioner and Patent Owner from before this dispute arose to be very informative as to the proper field of endeavor of the '924 patent. Petitioner and Petitioner's declarant both introduce the '924 patent as being directed to "computer devices that 'optically sens[e] human input' using one or more cameras, contemplating applications in a "variety of fields such as computing, gaming, medicine, and education." Ex. 1003 ¶ 32 (quoting Ex. 1001, 2:7–23); Pet. 1 (identical); *see also* Paper 8, 2 (Patent Owner highlighting similar disclosure). Petitioner and Petitioner's declarant then go on to describe both the embodiments of the '924 patent and the claims as requiring computer devices that optically sense human input using one or more cameras. Ex. 1003 ¶¶ 32–34; Pet. 1–3; *see also* Paper 8, 2–5 (Patent Owner highlighting similar disclosure).

IPR2021-00923
Patent 8,194,924 B2

Petitioner highlights that during prosecution all of the claims were amended to require two cameras. Pet. 4–5.

The parties' summaries of the '924 patent are generally consistent with the title, abstract, field of invention, and claims of the '924 patent. Ex. 1001, code (54) ("Camera based sensing . . ."), Abstr. ("TV camera and computer based sensing"), 2:7–23 ("optically sensing a human input"), claim 1 ("a first camera . . . and a second camera" "perform a control function of the handheld device based on at least one of the first camera output and the second camera output").

From the above disclosures, as well as the '924 patent generally, we agree with the parties that the '924 patent is directed to "computer devices that 'optically sens[e] human input' using one or more cameras." Ex. 1003 ¶ 32 (quoting Ex. 1001, 2:7–23); Pet. 1 (identical); *see also* Paper 8, 2 (Patent Owner highlighting similar disclosure). Implicit in this statement is that the human input is used to control the computer device.

Thus, Petitioner's field of endeavor of "a portable camera system that may be controlled by human gesture input" (Pet. 13) for the '924 patent, is both too narrow, "portable," and yet also too general, "human gesture input" not tied to optically sensing the input with a camera. If anything, camera based sensing of the input is the one feature that is present in all of the noted sections of the '924 patent and is highlighted by the parties. Interestingly, camera based sensing of the input is included in the fields of endeavor with respect to Amir and Aviv in the Petition, but absent without explanation in the first. This is a further reason why Petitioner does not satisfy it burden; the proper field of endeavor of the '924 patent should include camera based sensing of the input.

IPR2021-00923
Patent 8,194,924 B2

Further, as previously discussed, Mann does not disclose controlling a computer with human gesture input that is optically sensed with a camera.

For all of these reasons, Petitioner has not established by a preponderance of the evidence that Mann is analogous art to the '924 patent. Nor has Petitioner established that Mann is a proper reference for use in an obviousness challenge.

### d) Conclusion for Claims 1–6, 11, 14

As Petitioner has not established that Mann is a proper reference for use in an obviousness challenge, Petitioner has not established by a preponderance of the evidence that claims 1–6, 11, and 14 are obvious over the combination of Mann and Numazaki.

### 4. Obviousness over Mann, Numazaki and Amir or Aviv

Petitioner argues that the combination of Mann, Numazaki and Amir renders obvious dependent claims 7, 8, 10, 12, and 13. Pet. 49–59. Petitioner argues that the combination of Mann, Numazaki, and Aviv renders obvious dependent claims 6 and 9. *Id.* at 59–65.

As Petitioner has not established that Mann is a proper reference for use in an obviousness challenge, Petitioner has not established by a preponderance of the evidence that claims 6–10, 12, and 13 are obvious over any combination involving Mann.

### C. Jurisdiction over Expired Patents

Patent Owner argues that the USPTO does not have jurisdiction over expired patents. PO Resp. 1–2. Rather, Patent Owner argues, the USPTO only has jurisdiction over patents with claims that can be amended or cancelled. *Id.* Patent Owner states that, as explained by the Supreme Court, "Congress [has] significant latitude to assign [the] adjudication of public rights to entities other than Article III courts," including for the USPTO to

16

IPR2021-00923
Patent 8,194,924 B2

"reexamine—and perhaps cancel—a patent claim in an inter partes review." *Id.* (quoting *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1368, 1374 (2018). However, Patent Owner argues that this authority does not extend to expired patents because the public franchise associated with an issued patent no longer exists after expiration. *Id.* at 2. Thus, it is argued, the USPTO no longer has jurisdiction, even though the patent owner "may be entitled to collect damages" for patent infringement, because "the patent owner[] no longer has the right to exclude others" and the USPTO has nothing to cancel or amend. *Id.*

> Patent Owner reasons that:

> Expiration removes the patent from the [US]PTO's jurisdiction and returns it to the sole jurisdiction of the Article III courts, which have exclusive authority to govern claims for damages. If this were not so, the [US]PTO would purport to have authority to retroactively modify a public franchise that no longer exists, in a setting where the expired public franchise does not enjoy any presumption of validity and in which amendment of claims is no longer permitted.

*Id.*

> *Inter partes* review of patents, whether expired or not, fits within the USPTO's mandate "for the granting and issuing of patents" (35 U.S.C. § 2(a)(1)), for as the Supreme Court has stated, "[i]nter partes review is 'a second look at an earlier administrative grant of a patent'" (*Oil States Energy Servs.*, 138 S. Ct. at 1374 (quoting *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144 (2016)). Our rules have also made clear that *inter partes* review covers expired patents. 37 C.F.R. 42.100(b) (2012); *see also, e.g.*, 83 Fed. Reg. 51341 (Oct. 11, 2018) (Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial

IPR2021-00923
Patent 8,194,924 B2

and Appeal Board)[9] ("The claim construction standard adopted in this final rule also is consistent with the same standard that the Office has applied in interpreting claims of expired patents and soon-to-be expired patents. *See, e.g.*, *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1279 (Fed. Cir. 2017) (noting that '[t]he Board construes claims of an expired patent in accordance with *Phillips* . . . [and] [u]nder that standard, words of a claim are generally given their ordinary and customary meaning').").

Further, the statutes governing *inter partes* review do not limit them to non-expired patents. For example, 35 U.S.C. § 311(b), which sets forth the scope of *inter partes* review merely refers to patents, with no mention of the expiration date. Further, 35 U.S.C. § 311(c) entitled "Filing Deadline" makes no mention of the expiration date of the patent. Elsewhere, 35 U.S.C. § 315 does limit the filing of IPRs based on civil actions and the serving of complaints, but again makes no mention of the expiration date of the patent. Patent Owner does not identify any statute or legal precedent that expressly limits *inter partes* review to non-expired patents.

Patent Owner fails to adequately explain why the Patent Office's authority to take a second look at an earlier administrative grant of a patent ends when the patent term expires even though the rights granted by the patent are not yet exhausted.

For all of these reasons, we do not agree that the Board lacks jurisdiction over expired patents.

---

[9] Available at https://www.federalregister.gov/d/2018-22006/p-13.

IPR2021-00923
Patent 8,194,924 B2

## III. CONCLUSION

For the foregoing reasons, we determine that Petitioner has not proven, by a preponderance of the evidence, that the challenged claims are unpatentable, as summarized in the following table:

| Claims | 35 U.S.C. § | Reference(s) /Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–6, 11, 14 | 103(a) | Mann, Numazaki | | 1–6, 11, 14 |
| 7, 8, 10, 12, 13 | 103(a) | Mann, Numazaki, Amir | | 7, 8, 10, 12, 13 |
| 6, 9 | 103(a) | Mann, Numazaki, Aviv | | 6, 9 |
| **Overall Outcome** | | | | 1–14 |

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, claims 1–14 of U.S. Patent 8,194,924 B2 have not been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00923
Patent 8,194,924 B2

For PETITIONER:

Adam Seitz
Paul Hart
Erise IP, P.A
adam.seitz@eriseip.com
paul.hart@eriseip.com


Matthew D. Satchwell
Gianni Minutoli
Paul R. Steadman
DLA PIPER LLP
matthew.satchwell@dlapiper.com
gianni.minutoli@us.dlapiper.com
paul.steadman@dlapiper.com


Erika Arner
Daniel Cooley
Mingji Jin
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER LLP
erika.arner@finnegan.com
daniel.cooley@finnegan.com
mingji.jin@finnegan.com



PATENT OWNER:

Todd Landis
John Wittenzellner
WILLIAMS SIMONS & LANDIS PLLC
tlandis@wsltrial.com
johnw@wsltrial.com



US008194924B2

---

(12) **United States Patent**　　　(10) **Patent No.:** **US 8,194,924 B2**
Pryor　　　　　　　　　　　　　　(45) **Date of Patent:** **Jun. 5, 2012**

(54) **CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING OR OTHER DEVICES**

(76) Inventor: **Timothy R. Pryor**, Sylvania, OH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/051,698**

(22) Filed: **Mar. 18, 2011**

(65) **Prior Publication Data**

US 2011/0170746 A1　Jul. 14, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 12/834,281, filed on Jul. 12, 2010, now Pat. No. 7,933,431, which is a continuation of application No. 11/980,710, filed on Oct. 31, 2007, now Pat. No. 7,756,297, which is a continuation of application No. 10/893,534, filed on Jul. 19, 2004, now Pat. No. 7,401,783, which is a continuation of application No. 09/612,225, filed on Jul. 7, 2000, now Pat. No. 6,766,036.

(60) Provisional application No. 60/142,777, filed on Jul. 8, 1999.

(51) **Int. Cl.**
　**G06K 9/00**　(2006.01)

(52) **U.S. Cl.** ......................... **382/103**; 382/154; 382/312

(58) **Field of Classification Search** .................. 382/103, 382/154, 312
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,909,002 A　9/1975　Levy
4,219,847 A　8/1980　Pinkney et al.

| | | | |
|---|---|---|---|
| 4,339,798 A | 7/1982 | Hedges et al. | |
| 4,631,676 A | 12/1986 | Pugh | |
| 5,008,946 A | 4/1991 | Ando | |
| 5,088,928 A | 2/1992 | Chan | |
| 5,227,986 A | 7/1993 | Yokota et al. | |
| 5,297,061 A | 3/1994 | Dementhon et al. | |
| 5,388,059 A | 2/1995 | DeMenthon | |
| 5,491,507 A * | 2/1996 | Umezawa et al. ......... 348/14.02 |
| 5,581,276 A | 12/1996 | Cipolla et al. | |
| 5,594,469 A | 1/1997 | Freeman et al. | |
| 5,616,078 A | 4/1997 | Oh | |
| 5,624,117 A | 4/1997 | Ohkubo et al. | |
| 5,781,647 A | 7/1998 | Fishbine et al. | |
| 5,828,770 A * | 10/1998 | Leis et al. ..................... 382/103 |
| 5,845,006 A * | 12/1998 | Sumi et al. ..................... 382/154 |
| 5,853,327 A | 12/1998 | Gilboa | |
| 5,878,174 A | 3/1999 | Stewart et al. | |
| 5,926,168 A | 7/1999 | Fan | |
| 5,940,126 A * | 8/1999 | Kimura ..................... 348/294 |
| 6,204,852 B1 * | 3/2001 | Kumar et al. ................. 345/419 |
| 6,342,917 B1 | 1/2002 | Amenta | |
| 6,373,472 B1 | 4/2002 | Palalau et al. | |
| 6,442,465 B2 | 8/2002 | Breed et al. | |
| 6,585,709 B1 | 3/2003 | Karmarkar | |
| 6,597,817 B1 | 7/2003 | Silverbrook | |
| 6,775,361 B1 * | 8/2004 | Arai et al. ............ 379/93.17 |
| 6,788,336 B1 * | 9/2004 | Silverbrook ............ 348/207.2 |
| 6,911,972 B2 * | 6/2005 | Brinjes ..................... 345/175 |
| 7,489,863 B2 * | 2/2009 | Lee ..................... 396/429 |

* cited by examiner

*Primary Examiner* — Tom Y Lu
(74) *Attorney, Agent, or Firm* — Warner Norcross & Judd LLP

(57)　　　　　**ABSTRACT**

Method and apparatus are disclosed to enable rapid TV camera and computer based sensing in many practical applications, including, but not limited to, handheld devices, cars, and video games. Several unique forms of social video games are disclosed.

**14 Claims, 23 Drawing Sheets**



IPR2021-00923
Apple EX1001 Page 1



**FIG. 1A**



**FIG. 1B**

**FIG. 1C**

IPR2021-00923
Apple EX1001 Page 2



**FIG. 2A**

**FIG. 2B**

IPR2021-00923
Apple EX1001 Page 3



**FIG. 2C**

IPR2021-00923
Apple EX1001 Page 4



**FIG. 2D**



**FIG. 4A**

IPR2021-00923
Apple EX1001 Page 5



**FIG. 3A**



**FIG. 4B**

IPR2021-00923
Apple EX1001 Page 6



**FIG. 3B**



**FIG. 3C**



## FIG. 5A



## FIG. 5B

IPR2021-00923
Apple EX1001 Page 8



## FIG. 6



**FIG. 7**



**FIG. 9**



**FIG. 8A**

**FIG. 8B**

IPR2021-00923
Apple EX1001 Page 11



*FIG. 10A*



*FIG. 10B*

IPR2021-00923
Apple EX1001 Page 13



**FIG. 11A**

IPR2021-00923
Apple EX1001 Page 14



**FIG. 11B**

IPR2021-00923
Apple EX1001 Page 15



*FIG. 12*

IPR2021-00923
Apple EX1001 Page 16



*FIG. 13*

IPR2021-00923
Apple EX1001 Page 17



FIG. 14A

IPR2021-00923
Apple EX1001 Page 18



## FIG. 14B



## FIG. 14C

IPR2021-00923
Apple EX1001 Page 19



*FIG. 15*

IPR2021-00923
Apple EX1001 Page 20



FIG. 16

IPR2021-00923
Apple EX1001 Page 21

IPR2021-00923
Apple EX1001 Page 22

Case: 23-1494    Document: 15    Page: 99    Filed: 08/03/2023



*FIG. 17C*



*FIG. 17A*



*FIG. 17B*

IPR2021-00923
Apple EX1001 Page 23



Fig. 18

US 8,194,924 B2

1

# CAMERA BASED SENSING IN HANDHELD, MOBILE, GAMING OR OTHER DEVICES

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 12/834,281, filed Jul. 12, 2010 (now U.S. Pat. No. 7,933,431), which is a continuation of application Ser. No. 11/980,710, filed Oct. 31, 2007 (now U.S. Pat. No. 7,756,297), which is a continuation of application Ser. No. 10/893,534, filed Jul. 19, 2004 (now U.S. Pat. No. 7,401,783), which is a continuation of application Ser. No. 09/612,225, filed Jul. 7, 2000 (now U.S. Pat. No. 6,766,036), which claims the benefit of U.S. Provisional Application No. 60/142,777, filed Jul. 8, 1999.

Cross references to related co-pending US applications by the inventor having similar subject matter.

1. Touch TV and other Man Machine Interfaces: Ser. No. 09/435,854 filed Nov. 8, 1999, now U.S. Pat. No. 7,098,891; which was a continuation of application Ser. No. 07/946,908, now U.S. Pat. No. 5,982,352;

2. More Useful Man Machine Interfaces and Applications: Ser. No. 09/433,297 filed Nov. 3, 1999, now U.S. Pat. No. 6,750,848;

3. Useful Man Machine interfaces and applications: Ser. No. 09/138,339, Pub. Appln. 2002-0036617, now abandoned;

4. Vision Target based assembly: Ser. No. 08/469,907 filed Jun. 6, 1995, now U.S. Pat. No. 6,301,783;

5. Picture Taking method and apparatus: provisional application 60/133,671, and regular application Ser. No. 09/568,552 filed May 11, 2000, now U.S. Pat. No. 7,015,950;

6. Methods and Apparatus for Man Machine Interfaces and Related Activity: Provisional Application: provisional application 60/133,673 filed May 11, 1999; and regular application Ser. No. 09/568,554 filed May 11, 2000, now U.S. Pat. No. 6,545,670;

7. Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications: provisional application Ser. No. 60/183,807; and regular application Ser. No. 09/789,538, now U.S. Pat. No. 7,084,859; and

8. Apparel Manufacture and Distance Fashion Shopping in Both Present and Future: provisional application 60/187,397 filed Mar. 7, 2000.

The disclosures of the following U.S. patents and co-pending patent applications by the inventor, or the inventor and his colleagues, are incorporated herein by reference:

1. "Man machine Interfaces": U.S. application Ser. No. 09/435,854 and U.S. Pat. No. 5,982,352, and U.S. application Ser. No. 08/290,516, filed Aug. 15, 1994, now U.S. Pat. No. 6,008,000, the disclosure of both of which is contained in that of Ser. No. 09/435,854;

2. "Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/138,339, now Pub. Appln. 2002-0036617;

3. "More Useful Man Machine Interfaces and Applications": U.S. application Ser. No. 09/433,297, now U.S. Pat. No. 6,750,848;

4. "Methods and Apparatus for Man Machine Interfaces and Related Activity": U.S. Appln. Ser. No. 60/133,673 filed as regular application Ser. No. 09/568,554, now U.S. Pat. No. 6,545,670;

5. "Tactile Touch Screens for Automobile Dashboards, Interiors and Other Applications": U.S. provisional Appln. Ser. No. 60/183,807, filed Feb. 22, 2000, now filed as reg. application Ser. No. 09/789,538; and

2

6. "Apparel Manufacture and Distance Fashion Shopping in Both Present and Future": U.S. Appln. Ser. No. 60/187,397, filed Mar. 7, 2000.

## FIELD OF THE INVENTION

The invention relates to simple input devices for computers, particularly, but not necessarily, intended for use with 3-D graphically intensive activities, and operating by optically sensing a human input to a display screen or other object and/or the sensing of human positions or orientations. The invention herein is a continuation in part of several inventions of mine, listed above.

This continuation application seeks to provide further useful embodiments for improving the sensing of objects. Also disclosed are new applications in a variety of fields such as computing, gaming, medicine, and education. Further disclosed are improved systems for display and control purposes.

The invention uses single or multiple TV cameras whose output is analyzed and used as input to a computer, such as a home PC, to typically provide data concerning the location of parts of, or objects held by, a person or persons.

## DESCRIPTION OF RELATED ART

The above mentioned co-pending applications incorporated by reference discuss many prior art references in various pertinent fields, which form a background for this invention. Some more specific U.S. Patent references are for example:

DeMenthon—U.S. Pat. Nos. 5,388,059; 5,297,061; 5,227,985

Cipolla—U.S. Pat. No. 5,581,276

Pugh—U.S. Pat. No. 4,631,676

Pinckney—U.S. Pat. No. 4,219,847

## DESCRIPTION OF FIGURES

FIG. 1 illustrates a basic computer terminal embodiment of the invention, similar to that disclosed in copending applications.

FIG. 2 illustrates object tracking embodiments of the invention employing a pixel addressable camera.

FIG. 3 illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums.

FIG. 4 illustrates tracking embodiments of the invention using variation in color to identify and/or track object target datums.

FIG. 5 illustrates special camera designs for determining target position in addition to providing normal color images.

FIG. 6 identification and tracking with stereo pairs.

FIG. 7 illustrates use of an indicator or co-target.

FIG. 8 illustrates control of functions with the invention, using a handheld device which itself has functions.

FIG. 9 illustrates pointing at an object represented on a screen using a finger or laser pointer, and then manipulating the represented object using the invention.

FIG. 10 illustrates control of automobile or other functions with the invention, using detected knob, switch or slider positions.

FIG. 11 illustrates a board game embodiment of the invention.

FIG. 12 illustrates a generic game embodiment of the invention.

FIG. 13 illustrates a game embodiment of the invention, such as might be played in a bar.

IPR2021-00923
Apple EX1001 Page 25

US 8,194,924 B2

3                                                    4

FIG. **14** illustrates a laser pointer or other spot designator embodiment of the invention.

FIG. **15** illustrates a gesture based flirting game embodiment of the invention.

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

FIG. **17** illustrates a 3-D acoustic imaging embodiment of the invention.

FIG. **18** illustrates an improved handheld computer embodiment of the invention, in which the camera or cameras may be used to look at objects, screens and the like as well as look at the user.

THE INVENTION EMBODIMENTS

FIG. **1**

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired—either in two or three dimensions.

The embodiment depicted in FIG. **1**A illustrates the basic embodiments of many of my co-pending applications above. A stereo pair of cameras **100** and **101** located on each side of the upper surface of monitor **102** (for example a rear projection TV of 60 inch diagonal screen size) with display screen **103** facing the user, are connected to PC computer **106** (integrated in this case into the monitor housing), for example a 400 Mhz Pentium II. For appearances and protection a single extensive cover window may be used to cover both cameras and their associated light sources **110** and **111**, typically LEDs.

The LEDs in this application are typically used to illuminate targets associated with any of the fingers, hand, feet and head of the user, or objects such as **131** held by a user, **135** with hands **136** and **137**, and head **138**. These targets, such as circular target **140** and band target **141** on object **131** are desirably, but not necessarily, retro-reflective, and may be constituted by the object features themselves (e.g., a finger tip, such as **145**), or by features provided on clothing worn by the user (e.g., a shirt button **147** or polka dot **148**, or by artificial targets other than retroreflectors.

Alternatively, a three camera arrangement can be used, for example using additional camera **144**, to provide added sensitivity in certain angular and positional relationships. Still more cameras can be used to further improve matters, as desired. Alternatively, and or in addition, camera **144** can be used for other purposes, such as acquire images of objects such as persons, for transmission, storage or retrieval independent of the cameras used for datum and feature location determination.

For many applications, a single camera can suffice for measurement purposes as well, such as **160** shown in FIG. **1**B for example, used for simple 2 dimensional (2D) measurements in the xy plane perpendicular to the camera axis (z axis), or 3D (xyz, roll pitch yaw) where a target grouping, for example of three targets is used such as the natural features formed by the two eyes **164**, **165** and nose **166** of a human **167**. These features are roughly at known distances from each other, the data from which can be used to calculate the approximate position and orientation of the human face. Using for example the photogrammetric technique of Pinkney described below, the full 6 degree of freedom solution of the human face location and orientation can be achieved to an accuracy limited by the ability of the camera image processing software utilized to determine the centroids or other delineating geometric indicators of the position of the eyes and nose, (or some other facial feature such as the mouth), and the accuracy of the initial imputing of the spacing of the eyes and their respective spacing to the nose. Clearly if a standard human value is used (say for adult, or for a child or even by age) some lessening of precision results, since these spacings are used in the calculation of distance and orientation of the face of human **167** from the camera **160**.

In another generally more photogrammetrically accurate case, one might choose to use four special targets (e.g., glass bead retro-reflectors, or orange dots) **180**-**183** on the object **185** having known positional relationships relative to each other on the object surface, such as one inch centers. This is shown in FIG. **1**C, and may be used in conjunction with a pixel addressable camera such as described in FIG. **2** below, which allows one to rapidly determine the object position and orientation and track its movements in up to 6 degrees of freedom as disclosed by Pinkney U.S. Pat. No. 4,219,847 and technical papers referenced therein. For example, the system described above for FIGS. **1** and **2** involving the photogrammetric resolution of the relative position of three or more known target points as viewed by a camera is known and is described in a paper entitled "A Single Camera Method for the 6-Degree of Freedom Sprung Mass Response of Vehicles Redirected by Cable Barriers" presented by M. C. van Wijk and H. F. L. Pinkney to The Society of Photo-optical Instrumentation Engineers.

The stereo pair of cameras can also acquire a two view stereo image of the scene as well, which can be displayed in 3D using stereoscopic or auto-stereoscopic means, as well as transmitted or recorded as desired.

In many applications of the foregoing invention it is desirable not just to use a large screen but in fact one capable of displaying life size images. This particularly relates to human scaled images, giving a life-like presence to the data on the screen. In this way the natural response of the user with motions of hands, head, arms, etc., is scaled in "real" proportion to the data being presented.

FIG. **2**

This embodiment and others discloses special types of cameras useful with the invention. In the first case, that of FIG. **2**A, a pixel addressable camera such as the MAPP2200 made by IVP corporation of Sweden is used, which allows one to do many things useful for rapidly determining location of objects, their orientation and their motion.

For example, as shown in FIG. **2**A, an approximately circular image **201** of a target datum such as **180** on object **185** of FIG. **1**C may be acquired by scanning the pixel elements on a matrix array **205** on which the image is formed. Such an array in the future will have for example 1000.times.1000 pixels, or more (today the largest IVP makes is 512.times.512. The IVP also is not believed to be completely randomly addressable, which some future arrays will be).

As an illustration, computer **220** determines, after the array **205** has been interrogated, that the centroid "x, y" of the pixel elements on which the target image lies is at pixel x=500, y=300 (including a sub-fraction thereof in many cases). The centroid location can be determined for example by the moment method disclosed in the Pinkney patent, referenced above.

The target in this case is defined as a contrasting point on the object, and such contrast can be in color as well as, or

IPR2021-00923
Apple EX1001 Page 26

US 8,194,924 B2

5

instead of, intensity. Or with some added preprocessing, it can be a distinctive pattern on the object, such as a checkerboard or herringbone.

Subsequent Tracking

To subsequently track the movement of this target image, it is now only necessary to look in a small pixel window composed of a small number of pixels around the target. For example the square **230** shown, as the new position x'y' of the target image cannot be further distant within a short period of time elapsed from the first scan, and in consideration of the small required time to scan the window.

For example, if the window is 100.times.100 pixels, this can be scanned in 1 millisecond or less with such a pixel addressing camera, by interrogating only those pixels in the window, while still communicating with the camera over a relatively slow USB serial link of 12 mb transmission rate (representing 12,000 pixel gray level values in one millisecond).

One thus avoids the necessity to scan the whole field, once the starting target image position is identified. This can be known by an initial scan as mentioned, or can be known by having the user move an object with a target against a known location with respect to the camera such as a mechanical stop, and then indicate that tracking should start either by verbally saying so with voice recognition, or by actuating a control key such as **238** or whatever.

It is noted that if the tracking window is made large enough, then it can encompass a whole group of datums, such as **180-183** on an object.

FIG. 2B Reduction in Acquisition Time

Another application of such a pixel addressing camera is shown in FIG. 2B. One can look at the whole field, x y of the camera, **240**, but only address say every 10.sup.th pixel such as **250**, **251** and **252**, in each direction, i.e., for a total 10,000 pixels in a field of 1 million (1000.times.1000, say).

In this case computer **220** simply queries this fraction of the pixels in the image, knowing apriori that the target image such as **260** will have an image size larger than 10.times.10 pixels, and must be detectable, if of sufficient contrast, by one of the queried pixels. (For smaller or larger target images, the number and spacing of queried pixels can be adjusted accordingly). This for example, allows one to find approximate location of targets with only ¹⁄₁₀₀ the pixel interrogation time otherwise needed, for example, plus any gain obtained as disclosed above, by knowing in what region of the image to look (for example during tracking, or given some apriori knowledge of approximate location due to a particular aspect of the physical arrangement or the program in question).

Once a target has been approximately found as just described, the addressing can be optimized for that region of the image only, as disclosed in subsequent tracking section above.

Given the invention, the potential for target acquisition in a millisecond or two thus is achievable with simple pixel addressable CMOS cameras coming on stream now (today costing under $50), assuming the target points are easily identifiable from at least one of brightness (over a value), contrast (with respect to surroundings), color, color contrast, and more difficult, shape or pattern (e.g., a plaid, or herringbone portion of a shirt). This has major ramifications for the robustness of control systems built on such camera based acquisition, be they for controlling displays, or machines or whatever.

It's noted that with new 2000.times.2000 cameras coming on stream, it may only be necessary to look at every 15.sup.th or 20.sup.th pixel in each direction to get an adequate feel for target location. This means every 200.sup.th to 400.sup.th

6

pixel, not enough to cause image rendition difficulties even if totally dark grey (as it might be in a normal white light image if set up for IR wavelengths only).

FIG. 2C

Another method for finding the target in the first place with limited pixel interrogation is to look at pixels near a home point where a person for example indicates that the target is. This could be for example, placing ones fingernail such as **270**, whose natural or artificial (e.g., reflective nail polish) features are readily seen by the camera **275** and determined to be in the right corner of a pad **271** in FIG. 2C which approximately covers the field of view **274** of the camera **275**. The computer **220** analyzes the pixels in the right corner **278** of the image field **279** representing the pad portion **271** with the camera **275**, either continuously, or only when the finger for example hits a switch such as **280** at the edge of the pad, or on command (e.g., by the user pushing a button or key, or a voice message inputted via microphone **285** for example). After such acquisition, the target is then tracked to other locations in xy space of the pad, for example as described above. Its noted that it helps to provide a beep or other sound or indication when acquisition has been made.

Pick Windows in Real Time

Another aspect of the invention is that one can also pick the area of the image to interrogate at any desired moment. This can be done by creating a window of pixels with in the field to generate information, for example as discussed relative to a specific car dashboard application of FIG. **10**.

FIG. 2D—Scan Pattern

A pixel addressing camera also allows a computer such as **220** to cause scans to be generated which are not typical raster scans. For example circular or radial, or even odd shapes as desired. This can be done by providing from the computer the sequential addresses of the successive pixels on the camera chip whose detected voltages are to be queried.

A circular scan of pixels addressed at high speed can be used to identify when and where a target enters a field enclosed by the circular pixel scan. This is highly useful, and after that, the approximate location of the target can be determined by further scans of pixels in the target region.

For example consider addressing the pixels c1 c2 c3 . . . cn representing a circle **282** at the outer perimeter of the array, **285**, of 1000.times.1000 elements such as discussed above. The number of pixels in a full circle is approximately 1000 pi, which can be scanned even with USB (universal serial bus) limits at 300 times per second or better. For targets of ¹⁄₁₀₀ field in width, this means that a target image entering the field such as circular target image **289** (which is shown intersecting element cm and its neighbors) would have to travel ¹⁄₁₀₀ the field width in 0.0033 seconds to be totally missed in a worst case. If the image field corresponds to 20 inches in object field width this is 0.2 inches.times.300/sec or 60 inches/second, very fast for human movement, and not likely to be exceeded even where smaller targets are used.

Alternative shapes to circular "trip wire" perimeters may be used, such as squares, zig-zag, or other layouts of pixels to determine target presence. Once determined, a group of pixels such as group **292** can be interrogated to get a better determination of target location.

FIG. 3

Since many applications of the invention concern, or at least have present a human caused motion, or motion of a part of a human, or an object moved by a human, the identification and tracking problem can be simplified if the features of interest, either natural or artificial of the object provide some kind of change in appearance during such motion.

IPR2021-00923
Apple EX1001 Page 27

US 8,194,924 B2

7

FIG. **3** illustrates tracking embodiments of the invention using intensity variation to identify and/or track object target datums. In a simple case, a subtraction of successive images can aid in identifying zones in an image having movement of features as is well known. It is also useful to add pixel intensities of successive images in computer **220** for example. This is particular true with bright targets (with respect to their usual surroundings) such as LEDs or retro-reflectors. If the pixels in use by the camera are able to gather light preferentially at the same time a special illumination light is on, this will accentuate the target with respect to background. And if successive frames are taken in this way, not only will a stationary image of the special target build up, but if movement takes place the target image then will blur in a particular direction which itself can become identify-able. And the blur direction indicates direction of motion as well, at least in the 2-D plane of the pixel array used.

Another form of movement can take place artificially, where the target is purposely moved to provide an indication of its presence. This movement can be done by a human easily by just dithering ones finger for example (if a portion of the finger such as the tip is the target in question), or by vibrating an object having target features of interest on it, for example by moving the object up and down with ones hand.

For example consider FIG. **3**A, where a human **301** moves his finger **302** in a rapid up and down motion, creating different image positions sequentially in time of bright target ring **320**, **320'** on his finger, as seen by camera **325**. If the camera can read quickly enough each of these positions such as **326** and **327** in image field **328** can be resolved, other wise a blur image such as **330** is registered on the camera and recorded in the computer **335**.

Instead of using ones finger, it is also possible to create movement of a target for example with a tuning fork or other mechanism mechanically energizing the target movement, on what otherwise might be a static object say. And it is possible for the human, or a computer controlling the movement in question to create it in such a manner that it aids identification. For example, a certain number of moves of ones finger (e.g., 4), or 2 moves/sec of ones finger, or horizontal moves of ones finger etc., any or all of these could indicate to the computer upon analysis of the camera image, that a target was present.

The invention comprehends this as a method for acquiring the datum to be tracked in the first place, and has provided a camera mechanism for tracking fast enough not to lose the data, assuming a sufficiently distinct feature. For example, it is desirable to not require sophisticated image processing routines and the like if possible, to avoid the time it takes to execute same with affordable equipment. And yet in many scenes, finding a target cant be done easily today without some aid, either a high contrast target (contrasting brightness or color or both, for example). Or the aid can be movement as noted, which allows the search for the target to be at least localized to a small region of the field of view, and thence take much less time to run, even if a sophisticated algorithm is employed.

FIG. 3B illustrates an embodiment wherein a target which blinks optically is used. The simplest case is a modulated LED target such **340** on object **341** shown. Successive frames taken with camera **345** looking at pixel window **346** at **300** scans of the pixels within the window per second where the image **347** of the LED target is located, can determine, using computer **349** (which may be separate from, or incorporated with the image sensor), 5 complete blinks of target **340**, if blinked at a 60 hz rate. Both blink frequency, blink spacing,

8

blink pulse length can all be determined if the scan rate is sufficiently faster than the blink rate, or pulse time.

It should be noted that if the target **340** is a retro-reflector as in FIG. **1**, with an illumination source such as **355** near the axis of the camera, then the LEDs (or other sources) of the illuminator can be modulated, causing the same effect on the target.

Somewhat more sophisticated is the situation shown in FIG. 3C where a target **380** (on object **360**) illuminated by a light source **365** provides a time variant intensity change in the camera image **368** obtained by camera **370** as the target moves its position and that of the image. This can be achieved naturally by certain patterns of material such as herringbone, or by multifaceted reflectors such as cut diamonds (genuine or glass), which "twinkle" as the object moves. A relative high frequency "twinkle" in the image indicates then the presence of the target in that area of the image in which it is found.

When analog sensors such as PSD (position sensing diode) sensor **369** described in a copending application is used in addition to, or instead of a matrix array in camera **370**, the variation in light intensity or twinkle can be obtained directly from the detected output voltage from the signal conditioning of the sensor as shown in trace **375** corresponding to the movement of diamond target **380** a distance in the camera field. From the PSD one can also determine the position of the detected target image, theoretically at least independent of the intensity fluctuation.

For digital array detectors, the intensity variation can also be detected by subtracting images and observing the difference due to such variation. Such images need to be taken frequently if the twinkle frequency is high, and this can cause problems unless high speed camera scanning is possible. For example, in a twinkle mode, a pixel addressable camera using the invention herein could scan every 5.sup.th pixel in both x and y. This would allow a 1000 frame per second operation of a camera which would normally go 40 frames per second. Such a rate should be able to capture most twinkle effects with the assumption that the light field changes on more than 25 pixels. If less, then scan density would need to be increased to every 3.sup.rd pixel say, with a corresponding reduction in twinkle frequency detection obtainable.

FIG. 4

FIG. **4**A illustrates identification and tracking embodiments of the invention using color and color change in a manner similar in some aspects to the intensity variation in object datums described above.

Color can be used as has been noted previously to identify a target, as can a change in color with time. For example, a target can change its color in order to identify itself to successive interrogations of pixels on a color TV camera. This can be accomplished by having a retro-reflector which is illuminated in succession by light from different colored LEDs for example, in the arrangement of FIG. **1**. For example red led **401** illuminates retro reflector target **405** on object **406** during frame 1 (or partial frame, if not all pixels addressed) taken by camera **410**. Then yellow led **402** illuminates target **405** on the next frame, and so forth. For any reading of successive frames, one point in the image will appear to distinctly change color, while all other points will be more or less the same due to the room lighting overwhelming the led source illumination and the natural color rendition of the objects themselves.

To return color variation when moved, one can employ a target which changes color naturally as it moves, even with illumination of constant color. Such a target can contain a diffractive, refractive, or interference based element, for example, a reflective diffraction grating for example, which

IPR2021-00923
Apple EX1001 Page 28

US 8,194,924 B2

9

splits white light illumination into colors, which are seen differently as the target moves and changes angle with respect to the observer and/or illumination source.

For example, consider FIG. 4B showing reflective grating **440** on object **445** at initial position P. When illuminated by white light for example from lamp **450**, it reflects the spectrum such that when the object has moved to a new position P' the color (or colors, depending on the grating type, and angles involved) returning to camera **460** is changed. Such gratings can be purchased from Edmund Scientific company, and are typically made as replicas of ruled or holographic gratings.

Some types of natural features which change color are forms of jewelry which have different colored facets pointing in different directions. Also some clothes look different under illumination from different angles. This could be called then "color twinkle".

FIG. 5

FIG. **5** illustrates special camera designs for determining target position in addition to providing normal color images. As was pointed out in a co-pending application, it may be desirable to have two cameras looking at an object or area one for producing images of a person or scene, the other for feature location and tracking. These may be bore-sighted together using beam splitters or the like to look at the same field, or they may just have largely overlapping image fields. The reason this is desirable is to allow one to obtain images of activity in the field of view (e.g., a human playing a game) while at the same time ideally determine information concerning position or other aspects of features on the human or objects associated with him.

It is now of interest to consider a matrix array chip equipped with a special color filter on its face which passes a special wavelength in certain pixel regions, in addition to providing normal color rendition via RGB or other filtering techniques in the remaining regions. The chip could be pixel addressable, but does not have to be.

Version FIG. 5A

One version would have one special pixel filter such as **505**, for each square group of 4 pixels in an array **500** (one special pixel filter **505**, and 3 pixels, **510**-**512** filtered for RGB (red green blue) or similar, as is commonly used now for example. In one functional example, the special pixel **505** is purposely not read during creation of the normal image of a scene, but rather read only on alternate frames (or as desired) to determine target locations. If the array can be addressed pixel wise, the actual time lost doing this can be low. Since 25% of the pixels are effectively dead in forming the image in this example, and assuming all pixels are of equal area (not necessarily required), then 25% of the image needs to be filled in. This can be done advantageously in the image displayed, by making the color and intensity of this pixel the same as the resultant color and average intensity value of the other 3 in the cluster.

Version FIG. 5B

In this version, related to FIG. **2** above, and shown in FIG. **5**b, isolated pixels such as **530** (exaggerated in size for clarity) on array **531** or clusters of pixels such as **540**-**543**, are used to rapidly find a target with low resolution, such as round dot target image **550**. These pixels can ideally have special filters on their face, for example having near IR bandpass filters (of a wavelength which can still be seen by the camera, typically up to 1 um wavelength max). If takes only a few pixels to see the rough presence of a target, then in an image field of 1000.times.1000 pixels there could be one or more target images occupying 10.times.10 pixels or more. Thus in any group of 10.times.10, you could have 5 near IR filtered receptive pixels say, i.e., only 5% of the total pixel count but

10

sufficient to see the IR targets location to a modest accuracy. Once found, one can also use the "normal" pixels on which the target image also falls to aid in more precise determination of its location, for example using pixel group **555** composed of numerous pixels.

In short by having a camera with certain pixels responsive to selected wavelengths and/or scanned separately one can very rapidly scan for target features, then when found, take a regular picture if desired. Or just take regular pictures, until the necessity arises to determine target location.

Similarly the special filtered pixels such as **505** or **530** could be laser wavelength bandpass filtered for this purpose, used by the array for preferentially detecting laser light projected on an object (while ignoring other wavelengths). In a normal image, such a pixel would be nearly black as little white light passes (except that centered on the laser wavelength). To provide a normal picture using such a camera, the special IR or laser wavelengths pixels readings would be filed in with values and colors of light from the surrounding regions.

Such a laser wavelength filter can be extremely effective, even if a relatively weak laser is used to illuminate a large area, especially where retro-reflectors are used, and the light returned is concentrated by 1000 times or more.

FIG. 6

The embodiments above have dealt with finding just one target, and generally with just one camera, even though two or more cameras may be used for stereo imaging. Where stereo pairs of cameras are used, clearly each camera must see the target, if range via image disparity (the shift in location of a feature in the image in two camera views separated by a baseline) is to be determined.

Using the invention, one camera can be considered a master, the other a slave. The master camera determines target location by any of the means described above. Then the slave need only look at the expected pixel location of the target assuming some a priori knowledge of range which can come from previous target readings, or known range zones where the target has to lie in a given application.

Consider cameras **600** (master) with lens **603** and **601** (slave) having lens **604**, the axes of the two cameras separated by baseline **602** and with interfaced to computer **605**. The image of target **610** on object **615** is formed at position **620** on array **630** of camera **600**, and at position **621** on array **631** of camera **601**. The difference in position x in the direction of the baseline, in this simple situation is directly proportional to range z. The knowledge then of target image position **620** found by interrogating some or all of the pixels of camera **600** can as mentioned be used to more rapidly find image **621** in the image field of the "slave" camera **601**, and thus the z location of the target **610**.

For example if range is known to be an approximate value of z, one can look in the image field of the camera **601** along a line of points at a calculated value x away from the edge of the field, assuming **620** has been found to lie as shown near the corresponding edge of the field of camera **600**.

Two or more cameras may be used for stereo image analysis including object range and orientation data as discussed in FIGS. **1** and **6**. Range can also be determined via triangulation with a single camera and one target if projected on to the object in question at an angle to the camera axis from a laser say, or by using a single camera and 3 or more points on an object whose relative relationship is known (including the case of a line of points and an external point).

FIG. 7

As stated above, the TV camera of the invention can be used to see either natural or artificial features of objects. The

IPR2021-00923
Apple EX1001 Page 29

US 8,194,924 B2

11                                                                              12

former are just the object features, not those provided on the object especially for the purpose of enhancing the ability to determine the object location or other variable using computer analysis of TV camera images. Such natural features, as has been pointed out in many of the co-pending referenced applications, can be holes, corners, edges, indentations, protrusions, and the like of fingers, heads, objects held in the hand, or whatever.

But using simple inexpensive equipment it is often hard to determine the presence or location of such features in a rapid reliable enough manner to insure function of the application in question. In this case, one can employ one or more artificial features, provided on the object by attaching an artificial target onto the object, or manufacturing the object with such a target.

At least three types of artificial features can be employed.

1. The first is to provide special features required for object location, or orientation determination. Such a special feature can be of an optically contrasting material at the wavelength used to that of the object, for example a bright color, or a retroreflector;

2. The second is to provide one artificial feature (typically capable of more easily being found in an image than natural features of the object), and by finding it, localize to the region of that target environs the problem of finding any other features needed nearby; and

3. The third is to find an artificial feature on an object that actually by its shape, location, or coded features, provides a guide to the location of natural or other artificial features which are to be sensed in order to determine position or orientation of the same or related objects. This has been dubbed by me a co-target in co-pending applications incorporated by reference.

As shown in FIG. **7**, object **700** has co-target **701** at one end, visible to camera **705**. The co-target in this particular instance is a diamond shape, and is of high contrast for easy acquisition. For example it could be a yellow plastic retroreflector formed of molded corner cubes similar to those used on cars for taillights and other safety purposes.

The diamond shape in this case is significant for two reasons. First it is unusual relative to the object or background when used in the context intended, and makes the target still more identifiable (that is novel color, shape and brightness are all present). In addition, in this particular instance it has been chosen that a diamond shape, should indicate that the corners of the object are to be used for 6 axis position and orientation determination and that the choice of color for example, signifies that the object corners are within some predetermined distance from the target. If desired the target location on the object can also point to the corners. For example, in the drawing, the four corners of the diamond, **720-723**, point in the general direction of the four corners **730-733** of the rectangular object **700**.

FIG. **8**

The invention herein and disclosed in portions of other copending applications noted above, comprehends a combination of one or more TV cameras (or other suitable electro-optical sensors) and a computer to provide various position and orientation related functions of use. It also comprehends the combination of these functions with the basic task of generating, storing and/or transmitting a TV image of the scene acquired either in two or three dimensions.

FIG. **8A** illustrates control of functions with the invention, using a handheld device which itself has functions (for example, a cell phone). The purpose is to add functionality to

the device, without complicating its base function, and/or alternatively add a method to interact with the device to achieve other purposes.

The basic idea here is that a device which one holds in ones hand for use in its own right, can also be used with the invention herein to perform a control function by determining its position, orientation, pointing direction or other variable with respect to one or more external objects, using an optical sensing apparatus such as a TV camera located externally to sense the handheld device, or with a camera located in the handheld device, to sense datums or other information external for example to the device.

This can have important safety and convenience aspects to it, particularly when the device is used while driving a car or operating other machinery. To date voice recognition has been the only alternative to keying data in to small handheld devices, and voice is limited in many cases very limited if some physical movement is desired of the thing being communicated with.

A cellular phone **800** held in the hand of a user can be used to also signal functions in a car using a projected laser spot from built in laser spot projector **801** as in FIG. **14**, in this case detected by detector **802** on the dashboard **803**. Alternatively and or in conjunction, one may use features such as round dot targets **805-807** on the cell phone which are sensed, for example, by a TV camera **815** located in the car headliner **816** or alternatively for example in the dashboard (in this case the targets would be on the opposite end of the cell phone). More than one set of targets can be used, indeed for most generality, they would be an all sides which point in any direction where a camera could be located to look at them.

Remote control units and dictating units are also everyday examples of some devices of this type which can serve control purposes according to the invention. One of the advantages here is that it keeps the number of switches etc on the device proper to a minimum, while allowing a multitude of added functions, also in noisy environments where voice recognition could be difficult or undesirable for other reasons.

Use of specialized target datums or natural features of devices held in the hand, or used with cameras on such devices, allows photogrammetric techniques such as described in FIG. **1** to be used to determine the location in 6 degrees of freedom of the device with respect to external objects.

As one illustrative example, to signal a fax unit **824** in the car to print data coming through on the phone, the user just points (as illustrated in position **2**) the cell phone toward the fax, and the TV camera **815** scans the images of targets **805-807** on the face toward the camera, and the computer **830** connected to the camera analyzes the target images (including successive images if motion in a direction for example is used as an indicator, rather than pointing angle for example), determines the cell phone position and/or orientation or motion and commands the fax to print if such is signaled by the cell phone position orientation or motion chosen. The knowledge in space of the cell phone location and its pointing direction (and motion as pointed out above) provides information as to the fact that the fax was the intended target of the effort. Such data can be taught to the system, after the fact even if the fax or any other item desired to be controlled is added later.

Another version has a camera and requisite computer (and or transmission capability to an external computer) in the handheld device, such as a cell phone or whatever. When pointed at an object, the camera can acquire the image of the object and/or any natural features or special datums on the object which are needed to perform the function desired.

IPR2021-00923
Apple EX1001 Page 30

US 8,194,924 B2

13

One function is just to acquire an image for transmission via for example the cell phones own connection. This is illustrated in FIG. **8**B, where an image of object **849** acquired by camera **850** of cell phone **851** held by user **852** is transmitted over mobile phone link **853** to a remote location and displayed, for example. While this image can be of the user, or someone or something of interest, for example a house, if a real estate agent is making the call, it is also possible to acquire features of an object and use it to determine something.

For example, one purpose is recognition, for example one can point at the object, and let the computer recognize what it is from its TV image. Or point around in space taking multiple TV frames aiming in different directions, and when computer recognition of a desired object in one of the images takes place, transmit certain data to the object. Or it can be used to acquire and transmit to remote locations, only that data from recognized objects.

Thus the invention can provided on a hand held object for a variety of purposes,

To take images of things;

To determine datums on things; and

To automatically read things.

The combination of any or all of these functions in addition with other object functions such as hand held cell phones, dictation units, telephones, wearable computer devices and the like.

An alternative, shown with phantom lines in FIG. **8**A, to the some aspects of the above described operation of the embodiment is to use a laser pointer **801** in for example a cell phone to designate say the fax machine as shown. Then the TV camera **815** simply detects the presence of the laser pointer projected spot **820** on the fax, and via computer memory it is known that this is a device to be energized or connected in connection with the cell phone.

The camera located in a handheld device can also be used to point at a TV screen, such as that on the dashboard of a car, and to utilize data presented there for some purpose. For example, if pointed at a screen saying email message number **5**, the camera of the device can be used to obtain this image, recognize it through known character recognition techniques, and process it for transmission if desired. Or it might just say the message to the user of the phone through the speaker of the cell phone. Such a technique is not required if means exist to directly transmit the incoming information to the cell phone, but this may not be possible.

FIG. **9**

FIG. **9** illustrates pointing at a displayed image of an object represented on a screen using a finger or laser pointer, and then manipulating the represented object or a portion thereof using the invention. For example, consider user **901** pointing a laser pointer **905** at an image generated by computer **910** on display **912**, typically a large screen display (e.g., 5 feet diagonal or more) where control features here disclosed are of most value.

The user with the pointer, can point to an image or portion of the displayed image to be controlled, and then using the action of the pointer move the controlling portion of the image, for example a "virtual" slider control **930** projected on the screen whose lever **935** can be moved from left to right, to allow computer **910** sensing the image (for example by virtue of TV camera **940** looking at the screen as disclosed in copending applications) to make the appropriate change, for example in the heat in a room.

Alternatively one can also point at the object using ones fingers and using other aspects of the invention sense the

14

motions of ones fingers with respect to the virtually displayed images on the screen, such as turning of a knob, moving of a slider, throwing a switch etc.

Such controls are not totally physical, as you don't feel the knob, so to speak. But they are not totally virtual either, as you turn it or other wise actuate the control just as if it was physical. For maximum effect, the computer should update the display as you make the move, so that you at least get visual feedback of the knob turning. You could also get an appropriate sound if desired, for example from speaker **950**, like an increase in pitch of the sound as the knob is "moved" clockwise.

FIG. **10**

The above control aspects can in some forms be used in a car as well even with a small display, or in some cases without the display.

Or it can be a real knob which is sensed, for example by determining position of a target on a steering wheel or the fingers turning it tracked (as disclosed in co-pending application references).

For example, consider car steering wheel rim **1000** in FIG. **10**A. In particular, consider hinged targeted switch, **1010** (likely in a cluster of several switches) on or near the top of the wheel, when the car is pointed straight ahead, and actuated by the thumb of the driver **1011**. A camera **1020** located in the headliner **1025**, and read out by microcomputer **1025** senses representative target **1030** on switch **1010**, when the switch is moved to an up position exposing the target to the camera (or one could cover the target with ones fingers, and when you take a finger off, it is exposed, or conversely one can cover the target to actuate the action).

The camera senses that target **1010** is desired to be signaled and accordingly computer **1025** assures this function, such as turning on the radio. As long as the switch stays in the position, the radio is on. However other forms of control can be used where the switch and target snap back to an original position, and the next actuation, turns the radio off. And too, the time the switch is actuated can indicate a function, such as increasing the volume of the radio until one lets off the switch, and the target is sensed to have swung back to its original position and the increase in volume thus terminated.

In operating the invention in this manner, one can see position, velocity, orientation, excursion, or any other attribute of actuation desired. Because of the very low cost involved in incremental additions of functions, all kinds of things not normally sensed can be economically provided. For example the position of a datum **1040** on manually or alternatively automatically movable plastic air outlet **1041** in the dashboard **1042** can be sensed, indicative of the direction of airflow. The computer **1025** can combine this with other data concerning driver or passenger wishes, other outlets, air temperature and the like, to perfect control of the ambiance of the car interior.

It is also noted that the same TV camera used to sense switch positions, wheel position, duct position, seat position (for example using datum **1045**), head rest position (for example using datum **1046**), and a variety of other aspects of physical positions or motions of both the car controls and the driver or passengers. And it can do this without wires or other complicating devices such as rotary encoders which otherwise add to the service complexity and cost.

When the camera is located as shown, it can also see other things of interest on the dashboard and indeed the human driver himself, for example his head **1048**. This latter aspect has significance in that it can be used to determine numerous aspects such as:

IPR2021-00923
Apple EX1001 Page 31

US 8,194,924 B2

15

1. The identity of the driver. For example, if a certain band of height isn't reached, such as point P on the drivers head, the ignition can be interlocked. Much simpler than face recognition, but effective if properly interlocked to prevent repeated retries in a short time period.

2. The position of the head of the driver in case of an accident. As detailed in reference **4**, a camera or cameras can be used to determine head location, and indeed location of the upper torso if the field of view is large enough. This information can be used to control airbag deployment, or head rest position prior to or during an accident (noting too that head-rest position can also be monitored without adding any hardware). Particularly of interest is that the pixel addressing camera of the invention can have the frequency response to be useful in a crash, sensing the movement of the person (particularly severe if unrestrained) within a millisecond or two, and providing a measure of the position for airbag deployment. Additional cameras may also be used to aid the determination, by providing other views or observing other features, for example.

Using a pixel addressing camera for camera **1020** confers additional advantages. For example consider the image of the car interior produced by the camera lens **1021**, on matrix of pixels **1061**, whose addressing and processing is controlled by computer **1025**. In the first instance one can confine the window of view of a certain group of pixels of the total matrix **1061** to be only in the region of the steering wheel, as in window **1065** shown. This allows much faster readout of the more limited number of pixels, and thus of the steering wheel switches, at the expense of not seeing anywhere else in that particular reading. But this may be desirable in some cases, since it may only be required to scan for heater controls or seat positions, every 10 seconds say, while scanning for other more immediate items a hundred times per second or more. A good example are safety related functions. 5 per second might suffice for seeing where the turn signal or windshield washer control was, as an example. Window **1066** dotted lines is illustrative of a window specialized for head, headrest and seat positions, say.

Scans in certain areas of the image can also depend on information obtained. For example one may initiate a scan of a control position, based on the increasing or decreasing frequency of an event occurrence. For example if the persons head is in a different location for a significant number of scans made at 15 second intervals for example, then in case of a crash, this data could be considered unreliable. Thus the camera window corresponding to pixels in the zone of the head location **1048** could be scanned more frequently henceforward, either until the car stopped, or until such action settled down for example. Such action is often the case of a person listening to rock music, for example.

Similarly, if someone is detected operating the heater controls, a scan of predominately heater function controls and related zones like air outlets can be initiated. Thus while normal polling of heater controls might be every 2 seconds say, once action is detected, polling can increase in the window(s) in question to 40 times per second for example. The detection of action can be made first via the camera, or via input from some other input device such as a convention heater knob and electric circuit operable therewith.

Scans in certain areas of the image can also depend on information obtained in other areas of scan, or be initiated by other control actions or by voice. For example, if hard deacceleration was detected by an accelerometer, but before a crash occurred, the camera could immediately be commanded to begin scanning as fast as possible in the region of the image occupied by the driver and/or any other humans in

16

its field of view. This would be for the purpose of monitoring movements in a crash, if a crash came, in order to deploy an airbag for example.

One might utilize the invention to actuate a function, based on positions of people or other objects in the vehicle. As one example, suppose the drivers hand is resting on a console mounted gear lever. By scanning the image of this region, one can determine from the image the position of the console shift lever, and use the image thereof to control gear change via computer **1025**. However if the driver rests his hands on the windshield wiper stalk, it could in the same manner, become a column mounted gear lever so to speak. Or just be used for up down gear changes, like a paddle shifter on a racing car. In fact in the latter sense, the camera could be instructed to detect ones finger or hand movement to do this function for example, wherever one desired to rest ones hand (within the camera field of view at least). This function is also useful for physically disabled persons wishing to drive the car. And it can be different for different persons as well, via programming of the control functions associated with any given hand, switch or other position or movement.

FIG. **10**B illustrates alternative types of control mechanisms which can be used with the invention, in this case illustrated on the steering wheel of a car, although as can be appreciated, any suitable function or location may be used or created. And too, combinations of functions can be used. The invention is generic to car steering wheel controls, dishwashers, audio systems in ones home, heating and air conditioning elements and virtually all other forms of human related control functions. The key is that the camera computer combination makes a very inexpensive way to share a wide variety of functions with one or just a few basic systems and over a large population base.

As shown in FIG. **10**B, the steering wheel **1070** has two additional types of controls visible to camera **1020** and able to be sensed and generate the appropriate control function via computer. These are rotating device **1072** built to rotate around the steering wheel rim circular cross section, and expose a continuously variable, or digital step wise increment component to the camera. For example, three bars are shown, short **1075**, medium **1076**, and long **1077**. The computer senses which of the three is visible by comparing the length to pre-stored values (or taught values, see below), and causes the desired action to occur.

The second control **1080** is a sliding device **1081** which can be slid clockwise, or counterclockwise along a circumferential section of the steering wheel at the top, sides or whereever. As before, Its position is determined by camera **1020** again providing more data than just a switch up or down as shown before.

While illustrated on the steering wheel where it is readily at hand, it can be appreciated that the position of either the slider **1081** or the rotary device **1072**, or other similar devices for the purpose at hand could be elsewhere than the wheel, for example on stalk or on a piece of the dash, or other interior component indeed wherever a camera of the invention can view them without excessive obscuration by persons or things in the car. It need not be on a car either, controls of this type can be in the home or elsewhere. Indeed a viewable control datum can even be on a portable component such as ones key chain, phone, or article of clothing apparel, or whatever. Similarly the camera **1020** can view these items for other purposes as well.

The teach-ability of the invention is achieved by showing the camera the code marker in question (e.g., a short bar located on the wheel), and in the computer recording this data along with what it is supposed to signify as a control function

IPR2021-00923
Apple EX1001 Page 32

US 8,194,924 B2

17                                                                18

for example, turn rear wiper on to first setting. This added functionality of being easily changed after manufacture is an important advantage in some cases, as for example, today after-market addition of wired in accessories is difficult.

Games Using the Invention

The co-pending referenced applications have described games which can be played with target sensing and touch screen based devices, typically but not necessarily, electro-optically actuated (e.g., TV camera). The cameras of the invention can be used to, for example: Sense the player or players in the game or portions thereof; sense objects held or manipulated by the players (e.g., a ball, a pistol); sense physical tokens used in the game, such as monopoly game tokens; and sense game accessories such as checkerboards, croquet wickets; compare positions of objects with respect to other objects or players.

In addition, the cameras can be used to take images which can be displayed also a major feature given the ability to create life size displays. And the computer of the invention can be used to control the presentation of background image data from stored images, or even images downloaded from the internet for example.

Some or all of these aspects will now be illustrated in some representative game illustrations (again noting that some more are in the co-pending applications).

FIG. 11 Board Game

Even today, popular board games such as Monopoly and the like are being provided in computer playable form, with the "board" represented on the screen of the computer monitor. The invention here builds on this by providing various added features which allow a physical nature of the game just as the real game, but with new aspects and providing physical game play which can be transmitted over the internet to others. These features also can be turned off or on at as desired.

In one version shown in FIG. 11A, the player tokens such as 1101 and 1102 are observed by camera of the invention 1110 placed directly overhead of the play board 1115, which can for example be a traditional monopoly board (chess board, checker board, etc). points on the board such as corners 1130, 1131, 1132, and 1133 can also be observed to establish a reference coordinate system for the computer 1140 to track the moves of the markers, either from their natural features, or from specialized datums thereon (e.g., retro-reflective hat top 1141 on marker 1101). For example a train shape 1102 of a marker can be called from memory, or taught to the computer by showing it to the camera. Rotation invariant image analysis programs such as the PATMAX program from Cognex company can be used to identify the marker in any normal orientation, together with its location on the board (the board itself can be taught to the computer using the camera, but is preferably called up from memory).

The board position and relative scale in the field of view is determined easily by knowing the spacing of the corner points 1130-1133 and using this to calibrate the camera (to provide extra contrast, the corners can have retro-reflective glass bead edging or beading as shown). For example if the points are spaced 20 inch on corners of the board, and the camera is positioned so that 20 inches occupies 80% of its field of view, then the field of view is 25 inches square (for a square matrix of camera pixels), and each pixel of 1000 pixels square, occupies 0.025 inches in the object field.

The play of both players (and others as desired) can be displayed on the monitor 1150, along with an image of the board (which also can be called from computer memory). But other displays can be provided as well. For example to lend more realism to the game, the display (and if desired sound

from speaker 1155 connected to computer 1140) can also be programmed to show an image or sound that corresponds to the game. For example, when the camera image has provided information that one player has landed on "Boardwalk" (the most valuable property) a big building could be caused to be shown on the screen, corresponding to it also suitable sounds like wow or something provided).

The camera can be used to see monopoly money (or other game accessories) as well, and to provide input so the computer can count it or do whatever.

A large, wall sized for example, screen can add added realism, by allowing one to actually get the feeling of being inside the property purchased, for example.

One of the exciting aspects of this game is that it can be used to turn an existing board game into something different. For example, in the original monopoly the streets are named after those in Atlantic City. By using the computer, and say a DVD disc such as 1160 stored images of any city desired can be displayed, together with sounds. For example, one could land on the Gritti Palace Hotel in Venice, instead of Boardwalk. As shown in FIG. 11B, the TV camera senses the image of train marker 1101, and conveys this information to computer 1140, which causes the display 1150 and speaker of the invention to display the information desired by the program in use.

Making the game in software in this way, allows one to bring it home to any city desired. This is true of a pure (virtual) computer game as well, where the board only exists on the computer screen.

For added fun, for example in a small town context, local stores and properties could be used, together with local images, local personages appearing on the screen hawking them, and the like. A local bank could be displayed to take your money, (even with sounds of the local banker, or their jingle from the radio) etc. This makes the game much more local and interesting for many people. Given the ease of creating such local imagery and sounds with cameras such as digital camcorder 1151 used as an input of display imagery (e.g., from local celebrity 1158) to the game program, one can make any monopoly experience more interesting and fun at low cost.

The same holds true with other well known games, such as Clue, where local homes could be the mystery solving location, for example. One can also create games to order, by laying out ones own board. If one of the persons is remote, their move can be displayed on the screen 1150.

In the above, the display has been treated as sort of backdrop or illustration related. However, one can also create a whole new class of games in which the display and/or computer and the board are intertwined. For example as one takes a trip around the monopoly board, several chance related drawings opportunities occur during play. In this new game, such could be internet addresses one draws, which, via modem 1152, send the board game computer 1140 to any of a large number of potential internet sites where new experiences await, and are displayed in sight and sound on the display.

It should also be noted that the board can be displayed on the screen as well, or alternatively projected on a wall or table (from overhead). A particularly neat mixture of new and old is shown in FIG. 11B, where the board is displayed on a screen pointed vertically upward just as it would be on a table, and indeed in this case physically resident on a table 1165. The board is displayed (from software images or cad models of the board in computer 1166) on a high resolution table top HDTV LCD screen 1167 with a suitable protective plastic shield (not shown for clarity). Play can proceed just as before using

IPR2021-00923
Apple EX1001 Page 33

19

physical tokens such as **1101** and **1102**. In this case the display used to augment the game can actually be shown on the same screen as the board, if desired.

The TV camera **1110** in this context is used to see the tokens and any other objects of the game, the people as desired, and the play, as desired. The camera can be used to see the display screen, but the data concerning the board configuration displayed may be best imputed to the computer program from direct data used to create the display.

A beauty of the invention is that it allows the interaction of both computer generated images and simulations, with the play using normal objects, such as one might be accustomed to for example, or which give a "real" feel, or experience to the game.

FIG. **12** Sports Game

FIG. **12** illustrates a generic physical game of the invention using points such as **1201-1205** on the human (or humans) **1210** sensed by a TV camera such as stereo camera pair **1215** and transmitted to the computer of the invention **1220**. While points can be sensed in 2D, this illustration uses as stereo camera pair located on large screen display **1225** as shown to provide a unitary package built into the screen display (pointed out in other co-pending applications). In this particular instance a 3D display is illustrated, though this isn't necessary to obtain value and a good gaming experience. The human optionally wears red and green filter glasses **1235** such that red images on the screen are transmitted to one eye, green to another, so as to provide a 3D effect. Similarly crossed polarized filter glasses (with appropriate display), and any other sort of stereoscopic, or autosterescopic method can also be used, but the one illustrated is simple, requires no connecting wires to the human, and can be viewed by multiple uses, say in a gym aerobics room.

The game is generic, in that it totally depends on the program of the computer. For example, it can be an exercise game, in which one walks on a treadmill **1250**, but the image displayed on screen **1225** and sound from speakers **1255** and **1266** carry one through a Bavarian forest or the streets of New York as one walks, for example.

Or it can be a parasail game in which one flies over the water near Wakiki beach, with suitable images and sounds. In any case action determined by sensing position, velocity acceleration, or orientation of points **1201-1206** on the player, **1210** is converted by computer **1220** into commands for the display and sound system. Note in the figure this player is shown viewing the same screen as the treadmill walker. This has been shown for illustration purposes, and it is unlikely the same game could be applied to both, but it is possible.

It is noted that fast sensing, such as provided by the pixel addressing camera method disclosed above is highly desirable to allow realistic responses to be generated. This is especially true where velocities or accelerations need to be calculated from the point position data present in the image (and in comparison to previous images).

For example, consider points **1201** and **1202** on player **1210**. If point **1201** moves to **1201***a*, and **1202** moves to **1202***a* indicative of a quick jerk movement to turn the displayed parasail, this movement could occur in a 0.1 second. But the individual point movements to trace the action would have to be sensed in 0.01 second or quicker for example to even approximately determine the acceleration and thus force exerted on the glider, to cause it to move.

It is important to note that the invention is not only generic in so far as the variety of these games are concerned, but it also achieves the above with virtually no mechanical devices requiring maintenance and creating reliability problems

20

which can eliminate profits from arcade type businesses especially with ever more sophistication required of the games themselves.

FIG. **13** Bar Game

FIG. **13** illustrates a game which is in a class of gesture based games, in which the flirting game of FIG. **15** is also an example. In such games one senses the position, velocity or acceleration of a part of a person, or an object associated with the person. This can also include a sequence of positions, itself constituting the gesture. The detected data is then related to some goal of the contest. Consider FIG. **13**, wherein the object in ones hand is monitored using the invention, and a score or other result is determined based on the position, velocity, orientation or other variable of the object determined. For example, in a bar one can monitor the position, orientation, and rate of change thereof of drinking glasses.

A two person game is illustrated, but any reasonable number can play as long as the targets can all be tracked sufficiently for the game (in one test over 200 targets were acquired, but as can be appreciated this uses most of the field of view of the camera, and thus speed improvements made possible by pixel addressing become more difficult.

As shown, a single camera **1301** observes one or more targets such as **1305** on glass **1310** held by contestant **1315**, and target **1320** on glass **1325** of contestant **1330**. On a signal, each drinks, and a score is calculated by program resident in computer **1350** based on the time taken to raise the glass, and place it back empty on table **1355**. A display of the score, and an image desired, for example of the winner (taken with camera **1301** or another camera), or a funny image called from computer memory, is displayed on monitor display **1370**.

If the glass features are sufficiently distinct for reliable and rapid acquisition and tracking, for example as might be provided by an orange color, or a distinct shape, then specialized target features are not required.

Alternatively the velocity, path of movement of the glass (or other object), acceleration, or any other variable from which target data is sufficient to calculate, can be used to determine a score or other information to be presented or used.

FIG. **14**

The referenced co-pending applications have described a game where by laser pointers can be used to designate images on a TV screen. In this case of FIG. **14**A, the TV camera of the invention such as **1410** is used in a two player game to see laser pointer spots such as **1420** and **1421** projected by players **1430** and **1431** respectively, using laser pointers **1440** and **1441** respectively. When one player's spot hits the other, the event is recorded in memory of computer **1450** for further analysis and display.

In a somewhat different context, a person can use a laser pointer to point at an object to designate it for some purpose, for example for action. For example consider FIG. **14**B, in which housewife **1460** who points with laser pointer **1462** so as to provide a laser spot **1465** on dishwasher **1470**. TV camera of the invention **1475** in corner of the kitchen **1480** picks up all laser spots in an image of the room (made easier to process in terms of signal to background imagery if one locates a laser wavelength band-pass interference filter **1481** in front of the TV camera as shown) and compares via computer **1483**, the location of the spot detected in the image to stored memory locations of objects such as the dishwasher **1470** or fridge **1485** in the camera field of view, so as to identify the object needing action. In this case too, housewife may signal via a spatially variant laser pointer projection image (see copending referenced applications for further

IPR2021-00923
Apple EX1001 Page 34

US 8,194,924 B2

21

22

examples in other applications), or a series of spots in time, what action is desired, for example to turn the washer on. In this case the computer **1483** can cause a command to do so to be sent to the washer.

Any one with a simple laser pointer can make these commands effective. No learning is needed just point at the item desired, with the TV camera and computer of the invention acquiring the data and interpreting it. This is much simpler than remote controls of today, and a major advantage for those who have difficulty or inclination to learn complex electronic devices and procedures. It should be noted that these pointing procedures can easily be combined with voice recognition to further define the desired control activity for example inputting the housewife's voice in this example by virtue of microphone **1476**.

The stored locations can be taught. For example in a setup mode, one can point a laser pointer at the dishwasher, and indicate to the computer that that spot is the dishwasher. The indication can be provided by keyboard, voice recognition or any other means that is satisfactory.

Clearly other items can be monitored or controlled in this manner. The camera can also detect optical indications provided by other means, for example lights in the appliance itself. And one can detect whether light have been left on at night (or not left on) and cause them to be turned off or on as desired.

Such a camera if it is responsive to normal illumination as well as that of the laser wavelength, can also be used to see movements and locations of people. For example, it can look at the top of the stove, and assure that no movement is near the stove **1486**, or objects on it if programmed to do so, thus sounding an alarm if an infant should get near the stove, for example.

The housewife in the kitchen can also point at a board on which preprogrammed actions are represented. For example consider board **1490**, shown in greater detail in FIG. **14C**, in which 3 squares **1491-1493** are to represent different functions. Thus if **1491** is programmed (via keyboard, voice or whatever) to represent turning on the clothes dryer in the laundry, when the TV camera sees, and via the computer, identifies spot **1496** projected by the user on square **1491**, it causes the dryer to turn on. Operated in this manner, the board **1490**, in combination with a TV camera of the invention (such as **1475** or a more dedicated one for the board alone) and computer such as **1483** can be considered a form of touch screen, where the user, in this case in the kitchen can point at a portion of the board with a finger, or a laser pointer, and register a choice, much like touching an icon on a conventional computer touch screen.

Similarly, squares or other zones representing choices or the like can be on the item itself. For example, a stove can have four areas on its front, which can be pointed at individually for control purposes, what ever they are (e.g., representing heat settings, burner locations or the like). For security, it could be that only a coded sequence of laser pulses would be seen, or as pointed out in co-pending reference Ser. No. 60/133,673, a spatial code, for example representing the user such as an initial could be projected, and sensed on the object by the TV camera.

The laser pointer can be held in the hand of the user, or, like **1497** attached for example to a finger, such as forefinger **1498**. Or it can be on or in another object, desirably one which is often hand held in the normal course of work, such as a TV remote control, a large spoon, or the like. Or using other aspects of the invention, the finger of the user can be observed to point directly, and the object being pointed at determined. For example if finger **1498** is moved 4 times, it could indicate

to the TV camera and thence computer that channel four was desired on a TV display not shown.

If a special pointer is used, it can be any workable optical device, not necessarily a laser. The camera and computer of the invention can also be used to observe the user pointing directly, and compute the pointing vector, as has been described in my co-pending applications.

FIG. **15** A "Flirting" Game

Another game type is where the camera looks at the human, and the humans expressions are used in the game. In this case it is facial expressions, hand or body gestures that are the thing most used.

For example, one idea is to have a scene in a restaurant displayed on a display screen **1500**, preferably a large HDTV screen or wall projection to be as lifelike as possible, and preferably life size as well which lends extra realism to some games, such as this one due to the human element involved.

Let us consider that seated at the table in the restaurant displayed on the screen is a handsome man **1501** whose picture (likely a 3D rendered animation, or alternatively photo-imagery called from memory), and the goal for the girl **1510** playing the game is to flirt with this man until he gets up and comes over to say hello, ask her out or what ever (what he does, could be a function of the score obtained, even!).

Player **1510** seated at table **1511** (for authenticity, for example) is observed by TV camera **1515** (or stereo pair as desired, depending whether 3D information is thought required) and computer of the invention **1520**, which through software determines the position of eyebrows, lips, hands, fingers and any other features needed for the game. If necessary, specialized targets can be used as disclosed herein and elsewhere to augment this discrimination, for example such as optically contrasting nail polish, lipstick, eyeliner or other. Contrast can be in a color sense, or in a reflectivity sense such as even retro-reflective materials such as Scotchlite 7615 by 3M company. Even special targets can be used to enhance expressions if desired.

This can be a fun type game, as the response of the displayed person can be all kinds of things even contrary to the actual gestures if desired. Sounds, such as from speaker **1530** can also be added. And voice recognition of players words sensed by microphone **1550** can also be used, if verbal as well as expressive flirting is used.

While the game here has been illustrated in a popular flirting context, it is more generally described as a gesture based game. It can also be done with another contestant acting as the other player. And For example, the contestants can be spaced by the communication medium of the internet. The displayed characters on the screen (of the other player) can be real, or representations whose expressions and movements change due to sensed data from the player, transmitted in vector or other form to minimize communication bandwidth if desired.

Other games of interest might be:

"Down on the Farm" in which a farmer with live animals is displayed on a life size screen, and the children playing the game are to help the farmer by calling the animals to come over to them. This would use recognition of voice and gesture to make the animal images move and make sounds.

A player can find someone in a display and point at him, like the "Whereas Waldo" puzzle game. Then the subject moves, child runs to peek at him, and to find him, say running down a street whose image is displayed on the screen.

One can also use the camera of the invention to monitor the progress made by a child building blocks, and show an Video displayed image of a real skyscraper progressing as he builds

IPR2021-00923
Apple EX1001 Page 35

US 8,194,924 B2

23

his little version. Note the benefit of group activity like a board game and children's play with each other.

FIG. 16

FIG. **16** illustrates a version of the pixel addressing camera technique wherein two lines on either side of a 1000 element square array are designated as perimeter fence lines to initiate tracking or other action.

Some "pixel addressing" cameras such as the IVP MAPP 2500 512.times.512 element camera, are smart, that is can process on the same chip. However, in some cases the control of such a camera may not allow one to actually read just one pixel, say, but rather one must read the whole line on which the pixel rests. Now some processing can be in parallel such that no speed is lost, at least in many instances.

If however, one does have to read a whole line serially into a computer portion, then to fully see a 10.times.10 pixel round target say, one would have to read at least 10 lines.

If two targets both were located on the same lines, the time involved to read would be the same.

In the same vein, if lines of data must be scanned, then the approach of 2*b* wherein every 20.sup.th pixel say is interrogated can be specialized to having such pixels fall on scan lines wherever possible. And where one is restricted to reading all pixels on a scan line and where a target entry zone is anticipated, one can have a scan line oriented to be crossed by such entry. For example in FIG. **16**, the two lines **1601** (line of pixels **3**) and **1602** (line of pixels **997**) of a 1000.times.1000 element pixel array **1610** are designated as perimeter fence lines, to trigger a target tracking or other function on the entry of a target image on to the array, such as **1615** from either the right or left side in the drawing. This is often the case where entry from top or bottom is precluded by constraints of the application, such as a table top at the bottom, or the height of a person at the top. Or in a stereo example such as FIG. **6**, the baseline defines the direction of excursion of a target as z is varied again calling for crossing of scan lines out of the plane of the paper at some point.

The invention herein has provided an exciting method by which common board games can become more fun. The invention provides a link with that past, as well as all of the benefits of the video and computer revolution, also via the internet.

It is envisioned that the same approach may be applied to many card games as well. It is also thought that the invention will find use in creating ones own games, or in downloading from the internet others creations. For example, common everyday objects can become the tokens of the games, and taught to the game computer by presenting them to the video camera. Similarly, the people playing the game can be taught, including their names and interests.

FIG. 17

FIG. **17** illustrates a 3D acoustic imaging embodiment of the invention which at low cost may generate accurate 3D images of the insides of objects, when used in conjunction with ultrasonic transducers and particularly a matrix array of ultrasonic transducers.

As shown in FIG. **17A**, the position in xyz of the ultrasonic imaging head **1700** on wand **1701** held in a users hand **1702** is monitored electro-optically as taught in FIG. **1**, using a single camera **1710** and a simple four dot target set **1715** on the head **1700** at the end of the transducer wand **1701** in contact with the object to be examined **1720**. Alternatively, as also taught in FIG. **1**, a stereo pair for example providing higher resolution in angle can be employed.

Computer **1725** combines ultrasonic ranging data from the ultrasound transducer head **1700** and from the sensor of transducer location (in this case performed optically by camera

24

**1710** using the optically visible targets on the transducer head) in order to create a range image of the internal body of the object **1720** which is thus referenced accurately in space to the external coordinate system in the is case represented by the camera co-ordinates xy in the plane of the TV camera scan, and z in the optical axis of the camera.

In many cases it is also desirable to know the pointing angles of the transducer. One instance is where it is not possible to see the transducer itself due to obscuration, in which case the target may alternately be located at the end **1704** of the wand for example. Here the position and orientation of the wand is determined from the target data, and the known length of the wand to the tip is used, with the determined pointing angle in pitch and yaw (obtained from the foreshortening of the target spacings in the camera image field) to calculate the tip position in space.

This pitch and yaw determination also has another use however, and that is to determine any adjustments that need to be made in the ultrasonic transduction parameters or to the data obtained, realizing that the direction of ultrasound propagation from the transducer is also in the pointing direction. And that the variation in ultrasound response may be very dependent on the relation of this direction **1730** with respect to the normal **1735** of the surface **1736** of the object (the normal vector is shown for clarity pointing inward to the object).

The difference in direction can be calculated by using the TV camera (which could be a stereo pair for greater angular resolution) as well to determine the surface normal direction. This can, for example, be done by placing a target set such as **1740** on the surface in the field of the camera as shown. This can be dynamically or statically accomplished using the photogrammetric method described in the Pinkney references.

Differences in direction between the surface normal and the transducer pointing direction are then utilized by software in the computer **1725** of the invention in analysis of the ultrasound signals detected. The pointing angle and the position of the transducer on the surface of the object are used by the computer in predicting the location of various returns from internal points within the object, using a suitable coordinate transformation to relate them to the external coordinate reference of the TV camera.

All data, including transducer signals and wand location is fed to computer **1725** which then allows the 3D image of the inside of the body to be determined as the wand is moved around, by a human, or by a robot. This is really neat as all the images sequentially obtained in this manner can be combined in the computer to give an accurate 3D picture **1745** displayed on monitor **1750**.

In one preferred embodiment as shown in FIG. **17C**, the transducer head **1700** is comprised of a matrix **1755** of 72 individual transducer elements which send and receive ultrasound data at for example, 5 MHZ. This allows an expanded scan capability, since the sensor can be held steady at each discrete location xyz on the object surface, and a 3D image obtained with out movement of the transducer head, by analyzing the outputs of each of the transducers. Some earlier examples are described in articles such as: Richard E. Davidsen, 1996 IEEE Ultrasonics Symposium, A Multiplexed Two-Dimensional Array For Real Time Volumetric and B-Mode; Stephen W. Smith, 1995 IEEE Ultrasonics Symposium, Update On 2-D Array Transducers For Medical Ultrasound, 1995.

If the wand is now moved in space, fine scan resolution is obtained, due to the operation of the individual elements so positioned with out the need to move the wand in a fine pitch manner to all points needed for spatial resolution of this order.

IPR2021-00923
Apple EX1001 Page 36

US 8,194,924 B2

25                                                        26

This eases the operators task, if manually performed, and makes robotization of such examination much easier from a control point of view.

Consider FIG. **17**B which illustrates a transducer as just described, also with automatic compensation at each point for pointing angle, robotically positioned by robot, **1785** with respect to object **1764**. In this case a projection technique such as described in U.S. Pat. No. 5,854,491 is used to optically determine the attitude of the object surface, and the surface normal direction **1760** from the position of target set **1765** projected on the surface by diode laser set **1770**, and observed by TV Camera **1775** located typically near the working end of the robot. Differences between the normal direction and the transducer propagation direction (typically parallel to the housing of the transducer) is then used by computer **1777** to correct the data of the ultrasonic sensor **1780** whose pointing direction in space is known through the joint angle encoders and associated control system **1782** of robot **1785** holding the sensor. Alternatively the pointing direction of this sensor can be monitored by an external camera such as **1710** of FIG. **17**A.

It should be noted that the data obtained by TV camera **1775** concerning the normal to the surface and the surface range from the robot/ultrasonic sensor, can be used advantageously by the control system **1782** to position the robot and sensor with respect to the surface, in order to provide a fully automatic inspection of object **1764**. Indeed the camera sensor operating in triangulation can be used to establish the coordinates of the exterior surface of object **1764** as taught for example in U.S. Pat. No. 5,854,491, while at the same time, the acoustic sensor can determine the range to interior points which can be differentiated by their return signal time or other means. In this manner, a complete 3D map of the total object, interior and exterior, can be obtained relative to the coordinate system of the Robot, which can then be transformed to any coordinate system desired.

The invention has a myriad of applications beyond those specifically described herein. The games possible with the invention in particular are limited only by the imagination.

Consider hand held computer **1901** of FIG. **18**, incorporating a camera **1902** which can optionally be rotated about axis **1905** so as to look at the user or a portion thereof such as finger **1906**, or at objects at which it is pointed. Optionally, and often desirably, a stereo pair of cameras to further include camera **1910** can also be used. It too may rotate, as desired. Alternatively fixed cameras can be used when physical rotation is not desired, for ruggedness, ease of use, or other reasons (noting that fixed cameras have fixed fields of view, which limit versatility in some cases).

When aimed at the user, as shown, it can be used, for example, to view and obtain images of:

Ones self—facial expression etc, also for image reasons—id etc. combined effect.

Ones fingers (any or all), one finger to other and the like. This in turn allows conversing with the computer in a form of sign language which can replace the keyboard of a conventional computer.

One or more objects in ones hand. Includes a pencil or pen—and thus can be used rather than having a special touch screen and pencil if the pencil itself is tracked as disclosed in the above figure. It also allows small children to use the device, and those who cannot hold an ordinary stylus.

Ones gestures.

The camera **1902** (and **1910** if used, and if desired), can also be optionally rotated and used to view points in space ahead of the device, as shown in dotted lines **1902**a. In this position for example it can be used for the purposes described in the previous application. It can also be used to observe or point at (using optional laser pointer **1930**) Points such as **1935** on a wall or a mounted

LCD or projection display such as **1940** on a wall or elsewhere such as on the back of an airline seat.

With this feature of the invention, there is no requirement to carry a computer display with you as with an infrared connection (not shown) such as known in the art one can also transmit all normal control information to the display control computer **1951**. As displays become ubiquitous, this makes increasing sense—other wise the displays get bigger the computers smaller trend doesn't make sense if they need to be dragged around together. As one walks into a room, one uses the display or displays in that room (which might themselves be interconnected).

The camera unit **1902** can sense the location of the display in space relative to the handheld computer, using for example the four points **1955**-**1958** on the corners of the display as references. This allows the handheld device to become an accurate pointer for objects displayed on the screen, including control icons. And it allows the objects on the screen to be sensed directly by the camera—if one does not have the capability to spatially synchronize and coordinate the display driver with the handheld computer.

The camera can also be used to see gestures of others, as well as the user, and to acquire raw video images of objects in its field.

A reverse situation also exists where the cameras can be on the wall mounted display, such as cameras **1980** and **1981** can be used to look at the handheld computer module **1901** and determine its position and orientation relative to the display.

Note that a camera such as **1902**, looking at you the user, if attached to hand held unit, always has reference frame of that unit. If one works with a screen on a wall, one can aim the handheld unit with camera at it, and determine its reference frame to the handheld unit. Also can have two cameras operating together, one looking at wall thing, other at you (as **1902** and **1902**a) in this manner, one can dynamically compare ref frames of the display to the human input means in determining display parameters. This can be done in real time, and if so one can actually wave the handheld unit around while still imputing accurate data to the display using ones fingers, objects or whatever.

Use of a laser pointer such as **1930** incorporated into the handheld unit has also been disclosed in the referenced copending applications. For example, a camera on the hand held computer unit such as **1902** viewing in direction **1902**a would look at laser spot such as **1990** (which might or might not have come from the computers own laser pointer **1930**) on the wall display say, and recognized by color and size/shape reference to edge of screen, and to projected spots on screen.

The invention claimed is:
**1**. A handheld device comprising:
  a housing;
  a computer within the housing;
  a first camera oriented to view a user of the handheld device and having a first camera output; and
  a second camera oriented to view an object other than the user of the device and having a second camera output, wherein the first and second cameras include non-overlapping fields of view, and wherein the computer is adapted to perform a control function of the handheld device based on at least one of the first camera output and the second camera output.
**2**. The handheld device of claim **1** wherein the handheld device comprises a mobile phone.

IPR2021-00923
Apple EX1001 Page 37

US 8,194,924 B2

27

**3**. The handheld device of claim **1** wherein the first camera is adapted to acquire an image of at least a portion of the user.

**4**. The handheld device of claim **1** wherein the second camera is adapted to acquire an image of the object.

**5**. The handheld device of claim **1** wherein the second camera is adapted to acquire a video of the object.

**6**. The handheld device of claim **1** wherein the computer is operable to determine a gesture based on at least one of the first camera output and the second camera output.

**7**. The handheld device of claim **1** wherein the computer is operable to determine a facial expression based on at least one of the first camera output and the second camera output.

**8**. The handheld device of claim **1** wherein the computer is adapted to determine at least one of the position and the orientation of the object based on the second camera output.

**9**. The handheld device of claim **6** wherein the gesture is performed by a person other than the user of the handheld device.

28

**10**. The handheld device of claim **1** wherein the computer is adapted to recognize the object based on the second camera output.

**11**. The handheld device of claim **1** wherein the computer is adapted to generate control instructions for a display that is separate from the handheld device.

**12**. The handheld device of claim **1** wherein the computer is adapted to determine a reference frame of the object.

**13**. The handheld device of claim **1** wherein the computer is adapted to perform a control function based on the first camera output and based on the second camera output.

**14**. The handheld device of claim **1** wherein the computer is adapted to transmit information over an internet connection.

\* \* \* \* \*

IPR2021-00923
Apple EX1001 Page 38

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 8,354 words, excluding the parts of the brief exempted by Fed. Cir. R. 23(b)(2) and Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Abigail Colella*
Abigail Colella
*Counsel for Appellant Apple Inc.*